1
          UNITED STATES DISTRICT COURT
2          WESTERN DISTRICT OF MICHIGAN
               SOUTHERN DIVISION
3  _____

4  UNITED STATES OF AMERICA,

5                     Plaintiff,
                                    DOCKET NO. 1:18-cr-226
6  vs.

7
   NING XI,
8
                     Defendant.
9  _____/

10

11     TRANSCRIPT OF HEARING ON DEFENDANT'S MOTION FOR SUBPOENAS

12        BEFORE THE HONORABLE ROBERT J. JONKER, CHIEF JUDGE

13                   GRAND RAPIDS, MICHIGAN

14                   January 10, 2019

15

16  Court Reporter:          Glenda Trexler
                             Official Court Reporter
17                           United States District Court
                             685 Federal Building
18                           110 Michigan Street, N.W.
                             Grand Rapids, Michigan 49503
19

20  Proceedings reported by stenotype, transcript produced by

21  computer-aided transcription.

22

23

24

25

```
 1    A P P E A R A N C E S:

 2    FOR THE GOVERNMENT:

 3         MR. HAGEN W. FRANK
           UNITED STATES ATTORNEY'S OFFICE
 4         330 Ionia Avenue, N.W.
           P.O. Box 208
 5         Grand Rapids, Michigan 49501-0208
           Phone:  (616) 456-2404
 6         Email:  Hagen.frank@usdoj.gov

 7    FOR THE DEFENDANT:

 8         MR. RONALD S. SAFER
           RILEY, SAFER, HOLMES & CANCILA, LLP
 9         70 West Madison Street, Suite 2900
           Chicago, Illinois 60602
10         Phone:  (312) 471-8736
           Email:  rsafer@rshc-law.com
11
           MS. VALARIE HAYS
12         RILEY, SAFER, HOLMES & CANCILA, LLP
           70 West Madison Street, Suite 2900
13         Chicago, Illinois 60602
           Phone:  (312) 471-8781
14         Email:  vhays@rshc-law.com

15                         *   *   *   *   *

16

17

18

19

20

21

22

23

24

25
```

```
 1                              Grand Rapids, Michigan

 2                              January 10, 2019

 3                              2:01 p.m.

 4              P R O C E E D I N G S

 5         THE COURT:  We're here on the case of the

 6  United States against Ning Xi, 1:18-cr-226.  And we have a

 7  hearing on the motion for some early return subpoenas from the

 8  defense, and it's also a chance to talk a little bit more about

 9  the background of the case and make sure the Court understands

10  the government's theory.  And to the extent the defense is

11  ready to outline its intended defense, where we're going on

12  that.

13         But let's start with appearances, please.

14         MR. FRANK:  Good afternoon, Your Honor,

15  Assistant U.S. Attorney Hagen Frank for the United States, and

16  to my left is the lead case agent Special Agent Bruce Fowler

17  with the FBI.

18         THE COURT:  All right.

19         MR. SAFER:  Good afternoon, Your Honor, Ronald Safer

20  on behalf of Ning Xi.

21         THE COURT:  Okay.  I was wondering how you pronounce

22  it.  Say it again, please.

23         MR. SAFER:  Xi.

24         THE COURT:  Xi?  Thank you.

25         MR. SAFER:  And with me is Valarie Hays, also on
```

1    behalf of Dr. Xi.  And Ning Xi is present in court.

2         *THE COURT:*  All right.  Thank you.

3         I know it's your motion, Mr. Safer, but I want to

4    start with Mr. Frank and just get a sense of where the

5    government is going.  All I really have is the case file, which

6    is limited on any discovery, obviously.  And what I'm gathering

7    from the Indictment is that the government's got some

8    background in there but that your theory of the actual wire

9    fraud is tied to the specific instances you name seeking

10   airline fee reimbursement both from MSU and then from IEEE?

11        *MR. FRANK:*  IEEE, yes, Your Honor.

12        *THE COURT:*  Okay.  All right.  So give me -- that

13   much is -- I'm reading right.  Just give me a little bit more

14   of an overview of how you see the case developing from the

15   government's perspective and where you intend to go with it and

16   how you intend to prove it.

17        *MR. FRANK:*  Well, Your Honor, we have records from

18   MSU, from IEEE, or we'll refer to main IEEE, and then from a

19   fellow named -- it's pronounced Weihua Sheng, but it's spelled

20   W-E-I-H-A-U -- H-U-A -- excuse me -- H-U-A S-H-E-N-G.  He was

21   a -- he did his doctoral work under Dr. Xi at MSU and now he's

22   a tenured professor out at Oklahoma State University.

23        So the sources of our documents come from IEEE, from

24   MSU, from Weihua Sheng who served as the treasurer on the

25   conferences that were named that are recited in the Indictment

1    and had oversight over the bank accounts that were established

2    to fund those conferences.

3              As I said, Weihua Sheng and Dr. Xi go way back to

4    when Sheng was getting his doctoral -- doing his doctoral work.

5    And he served as a treasurer on these conferences that -- for

6    which Ning Xi, Dr. Xi, served as chair.  And these were -- the

7    overarching sponsor and organizer of these, these were

8    conducted under the auspices of IEEE.

9              The way that IEEE would run these conferences was

10   that the chair -- there would be two people who could draw on a

11   conference account, and it was the chair and the treasurer.

12   And so we got documents from Weihua Sheng that were given to

13   him by Dr. Xi, and he cut all these checks to Dr. Xi.  And

14   those checks were supported by air travel -- by air travel

15   receipts and itineraries that were fabricated and forged.

16             We know they were fabricated and forged -- or we will

17   prove that they were fabricated and forged because there were

18   multiple varieties of fraud.  In some cases the documents --

19   the ticket number never existed.  Because obviously we got

20   records from the airlines also.  That ticket number never

21   existed or that ticket number applied to a ticket, to a fare

22   that was flown by somebody other than Dr. Xi.  Different place,

23   different time, different person.  Or that ticket applied to a

24   booking that was made and then immediately canceled and never

25   flown, but nonetheless Dr. Xi would submit it for

 1    reimbursement.  So there was a big chunk of the fraud that

 2    involved these IEEE funds.

 3         Then in the same pattern of conduct we'll prove

 4    relative to Michigan State University of submitting travel

 5    reimbursement claims for travel that did not occur.  We'll

 6    prove the travel did not occur either because that ticket never

 7    existed or that ticket existed for a different person or that

 8    ticket was canceled and a refund was made, sometimes in the

 9    space of the same day, and then much later would be submitted

10    by Dr. Xi for reimbursement.

11         And then sometimes we've got itineraries where, you

12    know, sometimes he would put in the same claim, the same

13    provably fraudulent claim to MSU and IEEE and be reimbursed by

14    both of them for air travel.

15         So our focus -- and this even went on to -- extended

16    to the travel claims where he put in a claim for limo rides

17    between Okemos and Detroit and submitted forged documents in

18    support of that.

19         So in a nutshell our overarching theory of the case

20    is that we have someone who rose to a very high level in both

21    MSU and IEEE, he was a distinguished professor at MSU and he

22    was a fellow at IEEE, which put him in their hierarchy in the

23    top fraction of a percent of all the members of IEEE.

24         *THE COURT:*  Okay.  In terms of discovery you've

25    already provided the defense, can you summarize that?  And I

1    guess start with this:  Is there more to be produced, or have

2    you produced everything you've got?

3              MR. FRANK:  Your Honor, I'm not going to commit on

4    the record to having provided open-file discovery, but I think

5    we have --

6              THE COURT:  All right.

7              MR. FRANK:  -- at this point.  We have received a

8    massive volume of records from Michigan State University.  We

9    received all the records that Dr. Sheng out in Oklahoma had

10   archived from the various conferences for which he served as

11   treasurer.  We have received documents from IEEE.  We've

12   provided those in two and a half waves to the defense.

13             The defense also sent us a very detailed and

14   enumerated request for specific information wanting to know

15   whether we had provided that already or were going to provide

16   that.  We came back with what I think is a very fulsome

17   response saying, you know, this is what's been provided, this

18   is where you will find it in the provided materials.  So it's

19   not that -- we didn't just do a document dump on them and say

20   "Find it yourself."  We've given them what I think is a pretty

21   decent roadmap to where it is in the produced materials.

22             Last week we provided additional materials that we

23   had obtained from MSU.  I think that -- and I think it would be

24   humanly impossible for the defense to have digested all of that

25   at this point.  So I don't think that -- I'm confident that

1    they will not be in a position to say -- I would be surprised

2    if they were able to say at this point which items specified in

3    their motion they still need.  But I'm sure there will be

4    things that have not been provided that they still need.

5         So in terms of what still is forthcoming from the

6    government, at this point I don't see anything other than

7    Jencks materials, which obviously will be provided down the

8    road.  But there's quite a lot of it.

9         And the nature of these record systems too,

10   Your Honor, it's like MSU does not have a file room with

11   employee records.  They couldn't just go pull like Dr. Xi's

12   personnel folder or anything.  What their general counsel did

13   was over -- went to numerous different departments and offices

14   within MSU pulling anything they had on Dr. Xi.  And I would be

15   surprised if we haven't bled them dry.  And everything we've

16   gotten from them we have provided to the defense.

17        *THE COURT:*  All right.  One specific category you've

18   described in going through your overall theory of the case you

19   didn't mention in discovery.  That would be documents from

20   airlines.  Is that part of material you gathered and turned

21   over too or not?

22        *MR. FRANK:*  It is, but the defense wants records from

23   airlines that we did not subpoena and do not plan on

24   subpoenaing.  We've provided -- and I'll look over my shoulder

25   to my agent to correct me if I'm wrong -- but we provided

1   records from Delta, United, Lufthansa, and also records from

2   the online travel agency Orbitz.

3           THE COURT:  All right.  All right.  I guess the last

4   question in a general way before I hear from the defense, it's

5   an unopposed defense motion, so in some sense the course of

6   least resistance is just for me to grant it and be done because

7   you don't care.  But talk to me about that.  Because -- and

8   I'll hear more from Mr. Safer or Ms. Hays or whoever argues it,

9   but this looks a lot like civil discovery requests that I used

10  to write or respond to.  It's probably not quite as fulsome as

11  all of those, but it's in that nature.

12          You do a lot of document cases.  I mean, if we open

13  the door to this, we've got mini civil discovery in all your

14  criminal cases, and do you want that?  And is that -- why isn't

15  it of concern to the government if these subpoenas go to

16  companies or entities that you think are victims of the fraud?

17  Don't you want to be in between that?

18          MR. FRANK:  Well, the way I look at this, Your Honor,

19  is in all the discovery we've provided them, I have not seen

20  anything that is exculpatory or that can be spun as being

21  exculpatory.

22          By the same token, Dr. Xi's travel history -- we're

23  not saying he never traveled.  I mean, the man traveled

24  incessantly.  I've never had a case -- it's almost like that

25  movie where George Clooney flies around firing people.  I mean,

1    he's always in the air.

2            *THE COURT:*  Right.  *Up in the Air.*

3            *MR. FRANK:*  Right, *Up in the Air.*  Dr. Xi is like an

4    international George Clooney when it comes to travel frequency.

5    Trips to Europe, to the Far East.  From the Far East to Europe

6    back to the States.

7            We also know that -- and putting on these conferences

8    did require, you know, some level of travel.  Our theory of the

9    case is that he basically exploited his position as a fellow at

10   IEEE and as a distinguished professor at MSU -- who is not

11   going to be questioned by people in travel offices -- he

12   exploited that position to make a lot of money on the side.

13           The defense's theory of the case, I believe, is going

14   to be that, "Well, no, he was doing all this travel and it was

15   in support of these conferences.  And, sure, he was submitting

16   documents -- or rather claims that were supported by forged

17   documents, but he wasn't asking for money that he wasn't

18   entitled to."

19           The reason I think that's going to be the defense's

20   theory of the case is that Dr. Xi had retained the firm

21   Arent Fox in Washington, D.C. for about seven months before we

22   indicted him, and we had several meetings with

23   Peter Zeidenberg, Z-E-I-D-E-N-B-U-R-G, who is one of the

24   partners at  Arent.  We had three reverse proffers and evidence

25   reviews with them, and that was the theory that he advanced.

1    And I think that the defense request is -- yes, it's broad, but

2    I think that they are looking for pots of information that

3    might support this theory of, okay, these are fraudulent

4    documents, but all of this travel -- I mean, he was traveling a

5    lot and he was going to these places, and when he's at these

6    places he's doing things to prepare for these conferences.  And

7    these conferences are very big deals.  They pull experts from

8    all over the world to foreign countries to -- including

9    conferences to the U.S.

10           So I think what they are looking at is from a

11   due-diligence standpoint.  Because what we've shown them so

12   far -- and we have been very open, and we were very open

13   with Mr. Zeidenberg, showing him what we had and what our

14   theory of the case was, and he came up with what their -- and

15   obviously Mr. Safer is not committed to this defense -- but

16   Mr. Zeidenberg came up with a theory of the case, and then we

17   had another meeting and we told him why their presentation had

18   not caused us to lose faith in our proofs.

19           So I think that if I'm Mr. Safer, I'm looking at it

20   thinking "I'm not going to find much of a defense in the

21   discovery.  I've got to look outside of the discovery."  And I

22   will say our production goes well beyond our discovery

23   obligations.  I mean, there's a lot more than Rule 16, Brady,

24   Giglio, and -- Brady and Giglio in there.

25           If I'm Mr. Safer, I'm looking at it thinking "I've

1    got to go to these other places and see if there is the

2    material that I can try and build a defense with that says

3    okay" -- because they can't -- they are not going to be able to

4    contest that these documents were not forged and that he

5    actually flew the flights that he claimed.

6            THE COURT:  They might not characterize it as forged,

7    and we'll let Mr. Safer speak for it --

8            MR. FRANK:  Right.

9            THE COURT:  -- but they might characterize it as

10   mistakes because the guy is traveling all over the place and he

11   knows he was in, you know, Dubai or wherever but didn't get the

12   number right because he's going through all kinds of travel

13   documents.

14           MR. FRANK:  And that's -- that was part of the --

15   rather the approach that his prior counsel was taking.  So I

16   looked at their -- the materials that they are hoping to

17   subpoena, the types of information they are hoping to subpoena.

18   And, yes, I acknowledge that they are very broad, but this is

19   also a pretty unusual factual scenario.

20           So if I'm Mr. Safer, I am going to try and cast as

21   wide a net as possible in the hopes of being able to build -- I

22   mean, I'm confident I can build a picture about where he

23   wasn't, places he didn't go, and that he then turned around

24   consistently and over time submitted claims with forged

25   documents for travel he didn't take and that he was double

1    dipping as between MSU and IEEE.

2              THE COURT:  And how do you intend in summary to prove

3    that it wasn't just a series of mistakes but was actually the

4    product of an intentional scheme to defraud?  Just the sheer

5    volume of it or the nature?

6              MR. FRANK:  Because forging documents in the way that

7    they were forged and doing things like --

8              THE COURT:  When you say forged, though, I mean, that

9    carries a lot of freight.  That suggests, you know, to stick

10   with the movie reference, *Catch Me If You Can*, some guy sitting

11   there with, you know, checks that he's changing the meter code.

12   I don't hear you in that.  In the summaries here you say,

13   "Well, you know, there were ticket numbers that didn't match.

14   There were cancellations.  There were some double counts."

15   When you say forged --

16             MR. FRANK:  Forged is a subset of fraudulent.  I will

17   say fraudulent.  Some of them were forged.  I mean, when you --

18   airline itineraries know how to spell the cities that you're

19   flying to or from.  When you submit a document that purports to

20   be an airline document and it misspells Detroit, that's not a

21   genuine document.  So we have -- within this subset of

22   fraudulent documents, we have instances where, as I said, it's

23   submitting a claim for a flight that you booked, you got an

24   itinerary number, you canceled it, we've got your credit card

25   records showing that that -- there was an immediate refund of

1    that charge, but then you turned around and you submitted it

2    for payment.  So we've got forged documents.  We've got

3    fraudulent documents.

4         THE COURT:  So you have some of his credit card

5    records too?

6         MR. FRANK:  Oh, yes.  Yes, sir.  Credit card records

7    showing that the flight that he submitted a claim for was an

8    expense that was immediately refunded as soon as he canceled

9    the itinerary.

10        THE COURT:  All right.  Okay.  Why don't I go to the

11   defense and hear from Mr. Safer.  Thank you for the added

12   background.  And we'll get the defense perspective on the

13   motion, and if you want on anything else that you --

14        MR. FRANK:  Yes, Your Honor.  I would just add, as I

15   said, we've -- we've given them an awful lot of material to

16   digest, and because we got it from -- and there is repetition

17   within those pots of evidence because things came in piecemeal

18   from some of the airlines and things came in piecemeal from

19   different offices within MSU, so there's going to be repetition

20   within the bodies of or the categories of -- within the various

21   productions that we've turned over.  So once they go through

22   and they digest it and then they look at the things that they

23   are -- the bodies of documents that relate to their motion, I

24   wouldn't be surprised if this list pares down significantly.

25   But once they do figure out what they want that they don't have

1    and that we're not going to go get -- the reason I'm not

2    objecting to the motion is because I view this as -- I mean,

3    although the Court did bring up a law enforcement equity which

4    is setting an informal precedent -- the informal precedent that

5    you raised, that does implicate a law enforcement equity.  But

6    setting that aside, the way I look at it is this is really

7    about the defense trying to convince the Court that it would be

8    appropriate for you to exercise your authority to put the

9    subpoenas in a special category.  And given the nature of the

10   case, it did not strike me as unreasonable for them to be

11   asking for that.

12            *THE COURT:*  All right.  We'll go to Mr. Safer.  Thank

13   you.

14            Go ahead.

15            *MR. SAFER:*  Thank you, Your Honor.  I would like to

16   begin, because I don't want to forget to say it, that I think

17   the government's approach, Mr. Frank's approach in this case

18   has been exemplary.  I mean, there's no question that they have

19   turned over material that is beyond what is required at

20   Rule 16.  They have not only not dumped documents on us but

21   also tried to explain where those documents fit within their

22   theory.  And they have provided us voluminous documents.  I

23   think Mr. Frank's approach to this motion is also in the finest

24   traditions of the Department of Justice.  And so I want to

25   acknowledge that at the very outset.

1      I would also like to describe for Your Honor how --

2  why the documents sought are at the heart of our defense and

3  why they are necessary for us to put on a defense in this case.

4      Dr. Xi was, as Mr. Frank said, not only a top

5  executive at IEEE, a president of one of the sections and one

6  of the world's leaders -- remains one of the world's leaders in

7  robotics -- but somebody who was sought after as both a

8  presenter and an organizer of these conferences throughout the

9  world.  And as a result, he was flying all over the world

10 constantly.  And there is -- I don't -- as you heard, there's

11 not going to be a dispute about that.  He was at the vast

12 majority of the places that he has been reimbursed for.  He was

13 there, we think, at all of them.  I think there will be no

14 dispute about the vast majority of them.

15      Because of Dr. Xi's renown, he brought to

16 Michigan State tens of millions of dollars that -- much of

17 which was placed in a Michigan State account from which these

18 reimbursements were drawn.

19      We are seeking the records from that account that

20 will show that both the inflow and outflow from those

21 accounts -- because it goes directly to Dr. Xi's intent and his

22 lack of fraudulent intent -- he was able to withdraw money from

23 those accounts for --

24      *THE COURT:*  Help me understand how that helps on

25 intent.  Even if he generated a whole bunch of money for the

1    school, if he double-booked flights or double-charged them for

2    flights, it's still wrong.

3                MR. SAFER:  Absolutely.  And he didn't.

4                THE COURT:  Okay.  So how does it help you to see how

5    much money he brings into the university?

6                MR. SAFER:  Because under the regulations that we

7    also seek from Michigan State, he was able to withdraw that

8    money for a plethora of reasons.  That some of which are very

9    close to personal use.  But certainly if you want to say in

10   professional use for comfort, for food, for travel, for a

11   variety of different things.  If he were going to defraud

12   Michigan State University or if he were going to enrich himself

13   at Michigan State University's expense, he would have taken

14   money from that account with ease in any number of ways and

15   used it.

16               THE COURT:  So if the government hasn't -- I take it

17   the government hasn't produced records of those accounts?

18               MR. SAFER:  I don't think the government has the

19   records of those accounts.  They produced checks from the

20   account, but I don't think the government has --

21               THE COURT:  You haven't probably gotten through

22   everything yet that was just submitted.

23               MR. SAFER:  That is correct, Your Honor.

24               THE COURT:  Okay.  So, you know, this is a broader

25   question and a tactical one -- and I know you've prosecuted

1    plenty of cases -- from a defense perspective, though, why do
2    you really want this?  I mean, why don't you want to make that
3    argument to the jury that, "Look, you know, the government
4    hasn't even bothered to show you how these things really work
5    because they don't want you to know that Mr. Xi doesn't have
6    any motive or reason to do that.  There's a much easier pathway
7    if he really wanted a few hundred, a thousand bucks for a plane
8    ticket."  You know, normally that's what I imagine a defendant
9    is going to say in a case like this.  Look at all -- I mean,
10   you've actually got your ready-made list.  Look at all the
11   things that the government didn't bring you to prove intent.
12   How do you see all of this helping you develop the case?
13           MR. SAFER:  Your Honor is exactly right.  I think in
14   the typical case that's what a criminal defense attorney would
15   say.  This is not the typical case.  We are confident -- so,
16   first of all, I don't think it's true that the government
17   doesn't want to see what's there.  I think they have tried.  I
18   don't think they see the case from the same perspective as we
19   do, obviously.  But I don't think I would want to stand in
20   front of a jury and say that because I don't think it's true.
21           Secondly, in this -- this is the unique case where we
22   want to do two things.  First, we certainly want to say the
23   government approach is wrong, and hopefully I'll get to that in
24   a little bit as to where the government has taken perhaps
25   reasonable inferences from the evidence but inferences that are

1    incorrect and made mistakes as a result of that and that they

2    haven't -- they haven't examined the full picture.  And so we

3    certainly want to point that out.

4          But this is the unique case, Your Honor, where the

5    full picture is going to exonerate the defendant.  It's more

6    than just saying the government has failed in its burden of

7    proof.  We will -- if given the opportunity to have these

8    documents, we will prove him innocent.  We will prove that in

9    fact he did not defraud anybody, that these monies were

10   appropriately paid to him.  Indeed that he had legitimate

11   expenses that far exceeded the reimbursements that he got.  So

12   quite different from the conclusion that he double dipped and

13   that he enriched himself at these institutions' expenses.  He

14   absorbed losses.

15         *THE COURT:*  So let me -- and now I don't want you to

16   have to get farther than you want to go because obviously

17   you're still developing the case and you don't have to tell me

18   any of the defense at this point -- but let me just give you a

19   hypothetical.  If you thought you could show with these

20   accounts that the total money into the account and the total

21   money that Mr. Xi could have gotten out of it, because of money

22   he spent out of his pocket for a whole bunch of things in

23   addition to airlines, leaves the university in a net positive

24   position, even if one of the airline submissions is in the

25   words of Mr. Frank fraudulent, I mean, is that something you

1    think would mount a defense to the case, or am I overreading

2    the kinds of things that you're trying to develop?

3              *MR. SAFER:*  I think you're not overreading it,

4    Your Honor.  I don't think I was clear in the two different

5    ways we want to use the evidence.

6              One is in the account with regard to the inflows,

7    that's just the argument that goes to intent.  That he brought

8    a lot of money to Michigan State.  He was able to use that in a

9    broad number of ways.  If he wanted to defraud Michigan State,

10   that's how he would have done it.  He didn't intend to defraud.

11   Full stop, that's the end of that.

12             Now if we look at just the reimbursement aspect of

13   the case where he's traveling and he's doing these things for

14   Michigan State and for IEEE, if we look just at the money that

15   he actually spent out of his own pocket for that travel and

16   travel expense-related expenses and conference-related

17   expenses, without regard to what he brought in, we will find

18   that that amount, the outflow of money that he paid for that

19   travel, et cetera, exceeded the amount of money for which he

20   was reimbursed and was -- legitimately could have been

21   reimbursed for.

22             *THE COURT:*  All right.  So sticking with the sort of

23   hypothetical on that category, on any given conference he's got

24   to spend out of his pocket or advance a whole bunch of expenses

25   for meals, hotels, airlines, Uber, whatever else it may be, and

1    he gets money reimbursed for that whole array of things, and am

2    I hearing you that if you could establish it you think it would

3    be a valid defense in a case like that to say, "Well, even if

4    this particular line item, airline travel, is just plain wrong,

5    if the overall expenses that he incurred exceed the overall

6    dollars that he got, it's still not a fraud"?

7        *MR. SAFER:*  Yes, I think that's right, that in that

8    you have to take money or property.  You have to be -- you

9    know, the object of the fraud has to be to take money or

10   property, and he did not.  And so that -- that total

11   represents -- you know, shows that he did not have the intent

12   to get money or property from either of these organizations.

13       But second, it will make clear that none of those

14   quotations that were submitted for flights were fraudulent.

15   And now, Your Honor, I'll get to the -- you know, to the

16   issue -- those receipts or proof that was submitted were

17   neither forged nor really a mistake.  So I'll try to explain in

18   some detail, with the caveat that we haven't gotten all of the

19   material that we need.  But here is the general --

20       *THE COURT:*  And we can continue to speak in more or

21   less hypothetical terms because we're early in the case and I

22   understand you haven't had a chance to exhaust everything you

23   need to do, but at least you'll give me an idea of where you're

24   going and why these documents in your view would be critical.

25       *MR. SAFER:*  Thank you.  So Mr. -- Dr. Xi would take

trips for a number of different reasons.  Some of the trips
related and some of the legs of the trips related to a
conference that he was organizing or a conference that he was
putting together for IEEE.  And as Mr. Frank said, when these
trips are organized years -- these conferences are organized
years in advance.  So, for instance, there was a very big
conference in 2014.  The beginning of that organization -- of
the organization of that conference was in 2011.  And he -- and
Dr. Xi had -- was the conference chair, so he was charged with
getting sponsors for the organization -- for the conference,
getting presenters, getting an audience, getting the venue.
And so that required exhaustive travel.

But at the same time he might be in the same area of
the world and then he is presenting at a conference which helps
bring in some of those tens of millions of dollars to Michigan
State University because he presents and he gets support for
further research with regard to robotics.

Now, here is the complication for all of that:  In
order to save those organizations money, Dr. Xi bought
around-the-world tickets, which are tickets that as long as
you're going in the same direction --

THE COURT:  Right, I used to have clients in
Singapore who would get them regularly.

MR. SAFER:  All right.  So you're way ahead of me.

THE COURT:  No, I'm not way ahead of you, and that's

1    long ago, but at the time they cost around 15,000 bucks.

2              *MR. SAFER:*  Yeah.  Now they are between seven and

3    eight.

4              *THE COURT:*  Okay.

5              *MR. SAFER:*  But, of course, Dr. Xi could not or it

6    would not be right because there were different legs of the

7    trip that were responsible -- that were attributable to

8    different organizations.  He did not bill the entirety of that

9    ticket to, for example, Michigan State.

10             And now just to use examples, let's say that he was

11   traveling and there was one leg of the trip -- and it was

12   rarely this clean -- but there was one leg of the trip that was

13   to organize the conference and then one leg of the trip to

14   present a paper.  So the organization of the conference for

15   IEEE, the presentation of the paper for Michigan State.  What

16   Dr. -- so at the end of the day what Dr. Xi would do is he

17   would have somebody -- he'd say, "Okay, this leg of the trip

18   was for IEEE.  Bill them for that."  And what they would do was

19   they would often get a fare quotation, or even as Mr. Hagen

20   says purchase a round-trip ticket from those points of entry

21   and exit, and then cancel the ticket because -- and that would

22   give you a current price quotation for that, and then they

23   would submit that.

24             Now, the problem, of course, is it would have been

25   great if they had written on here "This is only a quotation.

1   We didn't take this exact flight.  We flew on an

2   around-the-world ticket."  Which was not done.  And therein

3   lies the problem.  Because you could call that a fraudulent

4   quotation when really -- really it was meant for a different

5   purpose.  It was meant to say "This is a representation of a

6   ticket for that leg and we're billing you for that."  And if we

7   get the documents that have all of those flights from all of

8   the airlines -- and one -- another wrinkle is that United, of

9   course, is part of the Star Alliance, and United will

10  present -- provide to the government, as they have, and the

11  government has provided to us the parts of that trip that

12  United flights are, but then they have open for their alliance

13  partners, we don't have that leg, and that those are important

14  legs.

15          *THE COURT:*  Let me just stick with that hypothetical

16  a minute.  Almost every around-the-world ticket situation I've

17  seen, if you added up the commercial price for the separate

18  legs, it's going to greatly exceed the around-the-world price.

19  I mean, that's the whole point of getting the around-the-world

20  ticket.  If somebody submits all of the separate legs and gets

21  reimbursement for the separate legs but only outflows, whether

22  it's 7,000 or 15,000, for the around-the-world ticket, how does

23  that fit with a wire fraud theory and a defense in your view?

24          *MR. SAFER:*  Then -- that's a wonderful question,

25  Your Honor.  One that we will raise with the jury.  Because

1    Dr. Xi was careful to make sure that the total reimbursement

2    that he submitted for those legs did not exceed the

3    around-the-world ticket.  And that's not something that

4    somebody who has the intent to defraud would do.

5              So was this done imperfectly?  It was.  But it was

6    not done -- if we can -- and this is the unique case.  You

7    know, I hope -- I mean, because we labored very hard to try to

8    tailor these requests so that they were not typical of civil

9    discovery but rather very focused on what we need for our

10   defense.  But I don't think this sets a precedent, Your Honor,

11   because this is -- you know, I'm sort of reminded of when you

12   said -- when you said that, what flashed through my mind was --

13   and I'm old -- so when the general manager of the New York

14   Giants was asked, "Hey, you've torn up Lawrence Taylor's

15   contract.  Doesn't that set a dangerous precedent?"  And he

16   said, "Yes, it sets a precedent.  What I would tell the next

17   person is 'If you play like Lawrence Taylor, I'll rip up your

18   contract too.'"

19             You know, I would say it sets a precedent in the next

20   case where somebody has flown thousands of flights literally in

21   an eight-year period of time, then there is going to be broad

22   discovery.  But that is -- this is that rare case.

23             So, you know, we need the -- so now we're back to the

24   form of the -- of what was submitted.  And the totals of what

25   is submitted.

1           One of the reasons we believe the government says

2    that there was double dipping is they do not understand because

3    they don't have all of the documents, and neither do we, what

4    those -- what the reimbursement checks were for.

5           So, for example, IEEE has -- gets a stack of

6    reimbursements and they will have -- they will issue a check

7    for $30,000 or there will be a check issued for $30,000.  That

8    has a whole bunch of receipts behind it.  But if you look at

9    the -- and, yes, sometimes those receipts are duplicated in

10   another pile, but you will -- but those receipts -- like I'll

11   give you a for-instance.  A hotel bill is submitted and it's

12   attributed to one conference.  That same hotel bill is found in

13   another pile for a different conference.  But all that's

14   reimbursed the second time is a restaurant tab because there

15   was a meal for that conference.  But it's the same receipt.

16   And so the two receipts are in the same pile.  But if you dig

17   into the details, some of which we have, some of which we do

18   not, and we believe IEEE will have and Michigan State will

19   have, you'll see that those receipts were not double-counted

20   and rather portions of them were used for different

21   reimbursements.  And that is what we are trying -- all that we

22   are trying to do is we are trying to show that there were

23   not -- there was not double dipping but rather that there was

24   reimburs -- proper reimbursement.

25           In terms of a personnel file, Your Honor, the -- we

1    believe that Michigan State does have a personnel file.

2          *THE COURT:*  You know, I didn't question Mr. Frank on

3    this, but Michigan has something called the Bullard-Plawecki

4    Right-to-Know Act which requires an employer to produce a

5    personnel file on the request of an employee or former

6    employee.  Why doesn't that get you what you want without a

7    subpoena?

8          *MR. SAFER:*  Well, we can try -- we can try that.  You

9    know, we can try that.  And we have, for example, tried to get

10   credit card records that we'll need and airline records without

11   burdening -- without asking the Court for a subpoena.  Although

12   some of those were not -- we're hitting brick walls and we're

13   going to need to subpoena, if the Court allows.

14         *THE COURT:*  Okay.  Other things that you want to

15   highlight?

16         *MR. SAFER:*  That is the essence of the theory of our

17   case, Your Honor, and why I think this is a very different case

18   than most and why we need this kind of detailed presentation --

19   detailed information from these entities.

20         *THE COURT:*  All right.  Thank you.

21         *MR. SAFER:*  Thank you, Your Honor.

22         *THE COURT:*  I'm going to give Mr. Frank a chance to

23   respond, and then I'll give you the last word on your own

24   motion.  Okay?

25         *MR. FRANK:*  In no particular order, Your Honor.

1    First off, I believe that all the account-related information

2    that Mr. Safer was talking about has been provided.  I think

3    once he's had -- he and his team have had a chance to look

4    through that, that may obviate the need for that subpoena.

5    But, again, that's what I mentioned before about how their list

6    may pare down once they have had a chance to chew through

7    everything we've given them.

8            The notion that -- and this is, of course -- this

9    will be something that we'll fight out at trial -- but the idea

10   that donations that came into MSU based upon Dr. Xi's being

11   there was somehow his funds, our proofs from MSU will establish

12   that, no, you donate money to MSU on Monday, on Tuesday that's

13   MSU's money and you don't get to pull it out without MSU's

14   approval.  So the idea that there's some sort of -- these

15   accounts were his money for the taking, the proofs will not

16   bear that out.  Nor will his tax returns for that matter.  And

17   those have also been provided to the defense.

18           Let's see, I could address the around-the-world

19   ticket theory, but, again, I'll save that for trial.

20           *THE COURT:*  Well, what's your general response?

21           *MR. FRANK:*  The general response is that, for

22   example, if you've got a 9,000 around-the-world ticket, $9,000

23   around-the-world ticket and then you submit claims that result

24   in you being paid $34,000 for that travel, you've committed

25   fraud.

1          *THE COURT:*  And I think what Mr. Safer is saying is
2    in his view the proofs will show that even if he broke up the
3    segments, he never ultimately asked for more than the 9,000 in
4    that example.  And that may be factually disputed --
5          *MR. FRANK:*  I think the proofs will show we've got
6    one instance where there's a $9,000 ticket and he was
7    reimbursed $34,000 in claims on that travel.
8          I guess the last thing I would point out.  I think
9    the Court was -- if I heard the question correctly -- I'll
10   paraphrase what I think I heard, and you can correct me if I
11   got it wrong.  As far as the fraud theory goes, the question in
12   essence was:  If you lie to get something that you're entitled
13   to, is that fraud?  The government's theory is no that's not
14   fraud.  Fraud requires -- the element of material
15   misrepresentation requires that you get something you're not
16   entitled to.  So if you lie to get something that you're
17   entitled to and you could have had simply by telling the truth,
18   that's not our theory of the case because we don't think that
19   would be fraud.
20         *THE COURT:*  All right.
21         *MR. FRANK:*  That's all I have at this time,
22   Your Honor.
23         *THE COURT:*  All right, thanks.  One other question I
24   meant to ask, and I'll give you both a chance to address it --
25   and this is really getting far afield from the issues today, so

1    if neither side is prepared to address or doesn't want to --

2    whenever I hear that somebody who used to study under this

3    defendant or vice versa somebody who used to be a professor is

4    producing documents for the other person, I'm always thinking

5    professional rivalry.  Is that an issue in the case?  In other

6    words, if the individual now in Oklahoma -- whose name I can't

7    pronounce anyway -- is a professional rival, there's certainly

8    a motive to say, "Hey, it's Mr. -- it's Dr. Xi, it's not me."

9            *MR. FRANK:*  Right.

10           *THE COURT:*  And, you know, he's the other person with

11   access to the same money.

12           *MR. FRANK:*  I think that's going to be -- I won't

13   call it a hard sell.  I think that's going to be an impossible

14   sell if that's where the defense wants to go with this.

15           *THE COURT:*  Okay.

16           *MR. FRANK:*  Because Dr. Sheng, his place in the food

17   chain -- and Mr. Safer is absolutely right, Dr. Xi is

18   world-renowned in the field of nanorobotics.  He's as big a

19   wheel as you become in this field.  And Dr. Sheng in that

20   pecking order is way down the totem pole.  And I think part of

21   it may also be a -- Dr. Sheng is a Chinese citizen.  I think

22   there's a cultural aspect there of you don't -- there are

23   certain people that you don't question.  If they tell you

24   something is so or that you -- you -- you don't push back.  It

25   may be in the American -- it may be in the DNA of people

1   brought up in the United States.  It's not necessarily

2   culturally the same in China.

3            And then there's also the aspect of, again, Dr. Xi is

4   as big a wheel as they come.  Dr. Sheng is not.  Dr. Sheng

5   looked up and admired Dr. Xi.  I don't think there's -- it

6   would never occur to Dr. Sheng that he was any kind of rival

7   with Dr. Xi.  He was just happy to be in the same room with

8   him.

9            *THE COURT:*  Well, this is far afield as I said, it's

10  a matter of argument, but I just bring it up because obviously

11  Dr. Xi would be less of a big wheel if he's convicted of a

12  federal felony.

13           *MR. FRANK:*  I'm sorry?

14           *THE COURT:*  He would obviously be less of a big wheel

15  if he's convicted of a federal felony and somebody else moved

16  in.

17           *MR. FRANK:*  Right.  If Dr. Xi got hit by a bus on the

18  way home, I'd have no doubt there would be people vying for his

19  spot, but Dr. Sheng is so far back in the pack, he's not going

20  to be that guy.

21           *THE COURT:*  All right.  Thanks.

22           Any last words on the motion, Mr. Safer?

23           *MR. SAFER:*  No, Your Honor.  Thank you for the

24  opportunity to discuss these matters with you.

25           *THE COURT:*  Well, thank you to counsel.  It was very

1    helpful for me because I have a lot less information than

2    either of you do about the case.  It is a somewhat unusual

3    case, I think.  Even though it's a wire fraud and we see that

4    all the time, and they are all document-intensive, the nature

5    of the case is a little different.  I noticed that when the

6    Indictment first came in.  And this has helped me get a better

7    understanding of at least on a preliminary basis where some of

8    the flashpoints might be.

9          What I'm going to do is give you a ruling today.  And

10   I'm going to deny the motion today.  I'm going to do it without

11   prejudice so that if Mr. Safer believes there are things after

12   he's had a chance to go through all of the document discovery

13   of the government that he still needs, he can refresh it.  But

14   I want to give you some more concrete reasons for it so that

15   you get an indication of what I'm likely to find fits and what

16   I'm likely to find doesn't.  And, of course, it doesn't

17   preclude you from bringing the request once again.

18         The request in criminal cases for pretrial production

19   of documents by subpoena is pretty unusual.  Certainly in this

20   district.  I've seen it a few times.  I think I've denied it

21   every time.  And that's because normally the Rule 17(c)

22   subpoena process is designed to be very focused, very limited.

23   And, of course, normally if you're subpoenaing documents,

24   you're subpoenaing them for production at trial, not for

25   pretrial examination as we do on the civil side.  And what the

1    Supreme Court has done, I think, in framing when there may be a

2    proper basis for exception to that, as the parties and

3    particularly Mr. Safer's brief outlines, under the Nixon

4    framework, just to summarize it, you need the relevance, you

5    need the accessibility, and then what I would call focus or

6    specificity as opposed to a fishing expedition.  Those are kind

7    of the three general categories of argument.

8              And let me start with the last one, the specificity.

9    I mean to cast no aspersions on the people who wrote the

10   request.  They are the kind of requests that I would have

11   wanted to write when I was in civil practice too.  But I think

12   they are the antithesis of specific requests.  They strike me

13   as very broad civil litigation-style requests.  They come

14   complete with definitions and instructions that are very broad.

15   You know, they want the term "document" to be used in the

16   broadest sense and include without limitation about 80 percent

17   of the page in terms of defining what that calls for.

18   "Concerning" means in any way, directly or indirectly

19   discussing, describing, regarding.  The request is not for a

20   particular policy or a particular, you know, faculty

21   requirement or whatever it may be but all MSU policies,

22   procedures, guidance, and training materials related to the

23   submission of expense reimbursement requests.  I can't even

24   imagine if I got that at MSU where I would begin to collect all

25   my policies through all of the different departments through

1    the entire university that deal with expense reimbursement.

2    And those are simply examples.  But what they tell me is that

3    for the most part the requests, at least as I read them, and

4    that's true for the IEEE requests as well as for the MSU

5    requests, they are crafted to be as inclusive as possible,

6    which naturally is what we do on the civil side, we see it all

7    the time, but in the civil side there's also very

8    well-established process and procedure under Rule 45 for the

9    protection of the party subpoenaed, for example, to come in.

10   And although that could happen in a criminal case, because they

11   rarely happen, there just isn't well-established procedures for

12   this.  So I'm situated with proposed subpoenas to the putative

13   victims of the fraud to come up with what amounts to massive

14   discovery requests and no established way for them to come to

15   me and complain about it.  I think that's problematic, and I

16   think that violates the spirit of what Nixon has in mind in the

17   specificity requirement.  And the cases that we referenced in

18   our earlier order at the lower court levels I think carry that

19   forward.  It's not supposed to be a discovery device.  17(c) is

20   supposed to be much more limited.  And these -- without going

21   into every single one of them -- strike me as too far afield.

22          And that really segues into relevance and

23   admissibility, which to some extent go hand in hand.  And what

24   Mr. Safer here has articulated helps me a lot more than just

25   the written brief.  The written brief was fine, but the

1    articulation of some particular concrete defense avenues helps

2    me understand more what some of the requests are directed to.

3            Before the hearing, before knowing that, I just went

4    through the requests on my own and outlined what I could

5    imagine if I were, you know, in defense counsel's perspective

6    what might be of greatest interest to me, without really

7    knowing exactly where the government was going or where the

8    defense was going.  And the one thing that I thought I would

9    definitely want to focus on, it's on page 4 of the brief, the

10   MSU subpoena paragraph 3, "All statements between 2008 and 2016

11   for MSU financial accounts from which Dr. Xi sought

12   reimbursement."  I have there "Maybe."  "Maybe."  I need to

13   understand more about it.

14           And that's where I am as I hear the argument today.

15   That kind of information, to the extent it isn't in the

16   government's discovery, would seem to be quite directly germane

17   to both aspects of the theory that Mr. Safer outlines.  The

18   general theory on intent:  If he wanted to steal, there were

19   lots of easier ways than forging airline vouchers.  And the

20   other being that these really weren't mistakes or fraud, they

21   were simply the practical effort to deal with things like

22   around-the-world tickets but the reality that individual

23   segments are properly allocable to different conferences along

24   the way.  And those kinds of statements would help the defense

25   to either demonstrate or fail to demonstrate that in breaking

1    out the segments of around-the-world tickets, you know, there

2    was in fact no over-reimbursement.  So maybe, but we'll have to

3    see, I think, first what's in the government's discovery.  I

4    think that's where the avenues first need to be exhausted to

5    preserve the ordinary process of the criminal discovery such as

6    it is and distinguish it from everything else.

7          The other things there, I mean, in some general sense

8    "All MSU policies and procedures and guidances" might have some

9    bare relevance, but it's hard for me to see how anything that I

10   can identify or even that Mr. Safer can identify now is readily

11   admissible.  You know, documents showing the MSU guidance,

12   recommendations, or procedures.  Same kind of thing, it seems

13   to me.

14         Furthermore, that to the extent they matter, they

15   probably should be in Mr. -- or Dr. Xi's possession already.

16   You know, when you get to 4, we're talking about all

17   communications on a whole series of things, which especially

18   given the definitions is vast.  And I can't imagine even if

19   there could be some potentially relevant item that there would

20   be anything I can readily identify as admissible now.

21         The personnel file, we already talked about the

22   Bullard-Plawecki Act in Michigan as being a much more direct

23   way to that than criminal subpoena.  And I can go through the

24   other items.  I don't see how, for example, courses taught by

25   Dr. Xi are particularly germane.  Plus, I'd expect those to be

```
 1    on Dr. Xi's CV anyway.

 2              So when you go over to the IEEE, the list is similar.

 3    After I listened to Mr. Safer today, I think that the two items

 4    that I had identified in advance, items 1 and 6 which deal with

 5    the same kinds of things that I referenced in that MSU list,

 6    may well turn out to be germane, might fit the Nixon framework

 7    if it's pared down to that and if it isn't in the government

 8    discovery, but the other items, again, strike me as overbroad,

 9    more in the aspect of a fishing discovery expedition as opposed

10    to a targeted look for relevant and admissible information.

11              So I'm not going to prevent Mr. Safer from coming

12    back after the defense has had a chance to complete its review

13    of the government discovery most recently submitted last week

14    and say "Hey, we're still missing some things."  Mr. Frank

15    thinks maybe you're missing, by the time you get through it

16    all, less than you think.  And then I'll look at it again under

17    the Nixon framework.  And by the time we get to that, if we do,

18    Mr. Safer, Ms. Hays, you'll have an opportunity to focus in

19    more directly in your briefing on the concerns I'm articulating

20    here and try to persuade me that you still need something if

21    you do.  But for today I'll deny the motion for those reasons

22    but without prejudice to submission of an additional request as

23    we go.

24              I don't think we have anything in terms of final

25    pretrial or trial until midsummer; is that right?
```

1        *MR. SAFER:*  I think June is the trial that's set at

2    the moment, Your Honor.

3        *THE COURT:*  Okay.  All right.  So we have time --

4        *MR. SAFER:*  Yes.

5        *THE COURT:*  -- even if we go on that.  And I gather

6    from the way you said that you might believe you need some more

7    time than that in any event.

8        *MR. SAFER:*  Yes, Your Honor.

9        *THE COURT:*  Okay.  Are there other things that we can

10   or should do today from the government's perspective?

11       *MR. FRANK:*  Um, I don't think so, Your Honor.  It

12   might be helpful to state for the record that we have got five

13   banker's boxes of documents at the FBI's Lansing office that

14   the defense wants to come copy.  I think we've already provided

15   digital copies of that information, but I have not done a

16   page-by-page matchup, so we're going to set that up.

17       *THE COURT:*  Then you have something to do on the

18   weekend, right?

19       *MR. FRANK:*  Exactly.

20       *MR. SAFER:*  While Mr. Frank is volunteering his time.

21       *MR. FRANK:*  I was about to say, I have to earn my

22   paycheck.

23       *THE COURT:*  That's right.  You're not on furlough,

24   you're on nonpay status probably.

25       *MR. FRANK:*  Yes, Your Honor.  Because my job involves

1    protection of life and property, so it's important that I be on

2    the job but not that I be paid.

3                    THE COURT:  Right.

4                    MR. FRANK:  In any event, we're going to get that

5    knocked out in the next couple of weeks.

6                    THE COURT:  Okay.  And from your perspective,

7    Mr. Safer, anything else today?

8                    MR. SAFER:  No, Your Honor.  Thank you.

9                    THE COURT:  Okay.  Thank you all.

10                   MS. HAYS:  Thank you, Your Honor.

11                   THE CLERK:  Court is in recess.

12          (Proceeding concluded at 3:03 p.m.)

13                          *   *   *   *   *

14          I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16          I further certify that the transcript fees and format

17   comply with those prescribed by the court and the Judicial

18   Conference of the United States.

19

20   Date:  April 24, 2019

21

22                         **/s/ Glenda Trexler**
                           _____
23                         Glenda Trexler, CSR-1436, RPR, CRR

24

25