1            UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF MICHIGAN
2                  SOUTHERN DIVISION

3    _____

4    UNITED STATES OF AMERICA,

5                        Plaintiff,
                                         DOCKET NO. 1:18-cr-226
6    vs.

7
     NING XI,
8
                        Defendant.
9    _____/

10

11        EXCERPT TRANSCRIPT FROM VOLUME II OF JURY TRIAL

12                GOVERNMENT OPENING STATEMENT

13        BEFORE THE HONORABLE ROBERT J. JONKER, CHIEF JUDGE

14                  GRAND RAPIDS, MICHIGAN

15                    June 19, 2019

16

17   Court Reporter:          Glenda Trexler
                              Official Court Reporter
18                            United States District Court
                              685 Federal Building
19                            110 Michigan Street, N.W.
                              Grand Rapids, Michigan 49503
20

21   Proceedings reported by stenotype, transcript produced by

22   computer-aided transcription.

23

24

25

```
 1    A P P E A R A N C E S:

 2    FOR THE GOVERNMENT:

 3         MR. HAGEN W. FRANK
           UNITED STATES ATTORNEY'S OFFICE
 4         330 Ionia Avenue, N.W.
           P.O. Box 208
 5         Grand Rapids, Michigan 49501-0208
           Phone:  (616) 456-2404
 6         Email:  Hagen.frank@usdoj.gov

 7         MR. CLAY STIFFLER
           UNITED STATES ATTORNEY'S OFFICE
 8         330 Ionia Avenue, N.W.
           P.O. Box 208
 9         Grand Rapids, Michigan 49501-0208
           Phone:  (616) 456-2404
10         Email:  Clay.Stiffler@usdoj.gov

11    FOR THE DEFENDANT:

12         MR. RONALD S. SAFER
           RILEY, SAFER, HOLMES & CANCILA, LLP
13         70 West Madison Street, Suite 2900
           Chicago, Illinois 60602
14         Phone:  (312) 471-8736
           Email:  rsafer@rshc-law.com
15
           MS. VALARIE HAYS
16         RILEY, SAFER, HOLMES & CANCILA, LLP
           70 West Madison Street, Suite 2900
17         Chicago, Illinois 60602
           Phone:  (312) 471-8781
18         Email:  vhays@rshc-law.com

19         MR. JOSEPH RICHARD COBURN
           RILEY, SAFER, HOLMES & CANCILA, LLP
20         121 West Washington Street, Suite 402
           Ann Arbor, Michigan 48104
21         Phone:  (734) 773-4913
           Email:  jcoburn@rshc-law.com

22
                        *   *   *   *   *
23

24

25
```

```
 1                              Grand Rapids, Michigan
 2                              June 19, 2019
 3                              8:36 a.m.
 4                     P R O C E E D I N G S
 5          (Jury entered the courtroom at 8:36 a.m.)
 6              THE COURT:  All right.  We'll consider court in
 7     session without the opening this morning, so please be seated.
 8              We're back here on the second day of trial in the
 9     case of the United States against Ning Xi.  As I told you
10     yesterday, Members of the Jury, we're going to start today with
11     the opening statements from the lawyers which are designed to
12     give you an introduction to the way each side sees the case and
13     the way each side will eventually argue you should see the
14     case.  It's a lot better than sitting through a whole day of
15     questions and answers, but it starts your business as jurors of
16     sitting on receive.  And I already told you yesterday I know
17     that's not an easy place to be.
18              So today you should plan that we'll go for an hour
19     and a half to two hours, take a break, come back, do another
20     segment, take a break, come back, and then finish out the day
21     by 2:00.  Hopefully that will allow everybody to stay focused
22     and give attention to what we've got going on here.  And we'll
23     get started because it's already 8:35, and I think the
24     government is probably ready to go with its opening.
25              Are you going to use the screen at all, Mr. Frank?
```

1          *MR. FRANK:* Yes, Your Honor, about halfway through.

2          *THE COURT:* All right. So we'll turn it over to

3    Mr. Frank for the opening statement of the government.

4          *MR. FRANK:* Good morning, ladies and gentlemen. I'm

5    going to take a little time now to give you a roadmap of the

6    evidence that the government thinks you'll be looking at over

7    the next several days. I'm not trying to -- right now I'm not

8    trying to persuade you of anything, because as the judge

9    mentioned yesterday there's no evidence in front of you yet and

10   it's the evidence that does the persuading in a room like this.

11          Now, like I said, my purpose is not to persuade.

12   This is to give you a preview of the evidence that's going to

13   come in. And you can analogize evidence to kind of like a

14   jigsaw puzzle. You pick up one piece of a jigsaw puzzle and

15   you may not recognize what it is or how it fits. Sometimes you

16   will know -- you'll recognize what a piece is, but you don't

17   know quite where it fits. So some pieces take longer to figure

18   out what it is and figure out how it fits. But once you've got

19   all the pieces together, well, then you know what you're

20   looking at because it looks like what's on the front of the

21   box.

22          Now, as the judge said, this is a fraud case against

23   Ning Xi. You're going to find out that he's a doctorate of

24   science which means his title is doctor, so he's Dr. Ning Xi.

25   You'll also learn that he was a distinguished professor at

1    Michigan State University in the Department of Electrical and

2    Computer Engineering.  You'll also learn that he was a

3    high-ranking member of this IEEE organization which is the

4    Institute of Electrical and Electronics Engineers.

5           Now, we all know what and where MSU is, but you're

6    going to learn about IEEE.  You'll learn that it's a

7    professional -- it's a worldwide professional organization

8    based in New York City.  And one of the things that it does is

9    it hosts and sponsors technical conferences all over the world.

10   It has a membership of over 400,000 people, and if you are an

11   electrical engineer, odds are you're a member of IEEE.

12          Now, in addition to being a distinguished professor

13   at MSU, you'll learn that Dr. Xi was a fellow at IEEE and that

14   only a small fraction of the top 1 percent of IEEE members are

15   fellows.  So we're talking about a defendant who held positions

16   of trust, respect, and prestige in two different institutions,

17   Michigan State University and IEEE.  And we're going to present

18   testimony and documents to you that we believe will prove to

19   you that Dr. Xi exploited those positions of trust, respect,

20   and prestige to steal hundreds of thousands of dollars from MSU

21   and IEEE.  The evidence, we think, is going to show you that he

22   did this, he accomplished this by lying about travel expenses

23   again and again and again year after year after year.

24          Now, we're not saying that he never traveled anywhere

25   on behalf of MSU.  He's a distinguished professor.  Of course

1    he traveled on behalf of MSU.  Of course he showed the Spartan

2    flag in other cities and other countries.  That was part of his

3    job.  So we're not saying he never traveled for MSU.

4         We're not saying he never traveled for IEEE.  He's a

5    fellow at IEEE.  Of course he traveled for IEEE.  But the

6    evidence is going to show -- and so the government's case is

7    not going to be that he was never entitled to any

8    reimbursement, but the evidence is going to show an unbroken

9    pattern of his submitting or having submitted false claims,

10   claims with false airline itineraries because the itinerary had

11   been booked, canceled, and already refunded when he put in to

12   be reimbursed.

13        And, of course, reimbursement means if I go do

14   something for you and I spend gas money and I spend an airplane

15   ticket and I need a hotel, then I come to you because I've done

16   this for you and I show you the documents and you pay me for my

17   out-of-cost expenses.  So that's what we're talking about when

18   we say reimbursement.  I think we probably all have the same

19   definition of that.

20        In any event, we'll show this pattern again and again

21   and again year after year of his submitting reimbursement

22   claims that contained false airline itineraries.  Because like

23   I said, either it was booked, canceled, and refunded or the

24   itineraries had been altered and manipulated.  Because when you

25   compare what he submitted to the actual airline records -- and

1   you'll learn that airlines, of course they keep records of

2   where you fly and when you fly.  They are big businesses, so

3   they keep accurate records.  When you compare these itineraries

4   that were submitted to the airline itineraries, mismatch.

5   Sometimes it's like, No, that flight didn't go there then.

6   Sometimes it was, Oh, yeah, that flight went from here to

7   there, but it wasn't Ning Xi going to Hong Kong, it was

8   Joe Smith going from Kentucky to Idaho.  So sometimes it's just

9   a completely different itinerary.  But we'll show you that

10  these itineraries that were submitted, sometimes it's a

11  complete mismatch with the airline records.  Sometimes a ticket

12  number doesn't even exist in the airline record system.

13          We'll show that often, again and again and again,

14  claims were submitted with the same itineraries multiple times

15  to different entities.  Here, MSU, reimburse me in full for

16  this.  Oh, and IEEE, reimburse me in full for the same thing.

17  You'll see that pattern.

18          You'll see claims submitted for simultaneous travel

19  to different parts of the world.  You'll see claims submitted

20  saying, well, I'm going from the United States to China that

21  way across the Pacific at the same time that a claim is

22  submitted saying, oh, I'm coming this way from China, that way

23  across the Pacific.  Well, unless you're an X man, it's kind of

24  hard to be going in the same direction -- different directions

25  at the same time.

1      So, for example -- and this is just a summary of some

2  exhibits you'll see -- you'll see an example like this.  And

3  the exhibit numbers are the exhibits that you'll be looking at

4  when you get a chance to deliberate.  You'll see here this

5  ticket number ending in 4066, a United ticket number, this is

6  an itinerary that was submitted in a travel claim to MSU.  And

7  during your deliberations, I mean, you're going to have --

8  you'll be looking at a lot of pieces of paper, but you'll see

9  that, okay, here is this ticket number ending in 4066, here is

10 the record from United saying, Nope, nothing for Ning Xi with

11 this ticket number in our system.  So right there.  And you'll

12 see the dates, 6 September to 13 September, and when you look

13 at the itinerary, Detroit through some connection cities into

14 Chicago, it's basically a Detroit, Hong Kong, back to Detroit

15 trip.  Round trip from Detroit to Hong Kong and back.

16 Supposedly in 6 -- what is that, the second week of September.

17 The problem is, nope, that ticket number, not in the records of

18 United.

19      Next page, please.

20      Now, in that same exhibit series you'll see, okay,

21 well, here is another claim.

22      Is it possible to blow that up on the left side a

23 little bit?

24      Okay.  You'll see this itinerary for $2,085.10.

25 You'll see in the records of United that that was voided.

1     Okay?

2               Back out.

3               Well, it's interesting, because here are two

4     different itineraries that the evidence will show were

5     submitted to two different IEEE conferences, that is to be

6     reimbursed from two different conference budgets.  And the

7     first one -- blow up this area -- the first one was for -- look

8     at that, 6 September, kind of hard to see, but, again, that

9     first week in September, Detroit, Hong Kong, and back.  So this

10    is a claim that is submitted for 3,430.85.  Five hundred bucks

11    more than the ticket price over here.  And the ticket was

12    voided.  But that itinerary went in for a claim and was paid

13    out of an IEEE budget or account.

14              Then -- back out, please -- we go over here and we

15    see that ticket number again, but this time it's for a round

16    trip from Detroit to Hong Kong and back, and now it's in the

17    first week of November.  But it's the same ticket number.  And

18    this time it's been bumped up $500.  The other one was bumped

19    up a thousand dollars.  So you'll have this evidence where

20    you'll see this pattern of tickets being submitted for

21    reimbursement that aren't in the system at all or that were

22    booked and voided, which means they didn't fly, and where the

23    cost was increased 500 bucks here and then a thousand bucks

24    this time.  And all at the same time, at least as far as that

25    first submission to MSU and this ticket on the left or in the

1   center of the screen, where, wait a minute, if I'm going from

2   Detroit to Hong Kong and back, do I get fully reimbursed by

3   both MSU and IEEE?  And when you compare these documents,

4   you'll see these are imaginary itineraries to begin with.

5         Or you'll see -- this is also a series of exhibits

6   that you'll get to look at.  This is a trip to Budapest in 2011

7   in late June.  And this is a graphic.  These aren't the actual

8   exhibits.  But you'll learn that it's no surprise probably that

9   the U.S. government keeps track of when people come into this

10  country and when they leave.  It's an agency called CBP,

11  U.S. Customs and Border Protection.  So the government keeps

12  track of when people leave and come back.  And you'll have a

13  chart of all of the travel that CBP -- the exits and entries

14  from the United States that CBP has for Dr. Xi.

15        And those records will show up here that, okay, HKG

16  is Hong Kong.  He came in from Hong Kong to Detroit on June 22,

17  2011.  Then he left on 1 July 2011.  ORD, as you probably know,

18  is Chicago.  CDG is Charles de Gaulle in Paris.  So he leaves

19  on 1 July on his way to Paris, and then he doesn't come back in

20  until the 8th of August from Bangkok.  He flies into LAX,

21  Los Angeles.  So we know, okay, he's not in the country from

22  1 July until 8 August.  But then you'll see this series of

23  submissions here where he submits a claim to MSU saying, okay,

24  I came in on the 22nd of June and I left on the 11th of July

25  going back to Hong Kong.

1          Well, you'll probably reasonably ask, how do you

2    leave from the United States for Hong Kong on 11 July if you're

3    not even in the country?  And you won't be back in the country

4    until the 8th of August.  But that itinerary right there was

5    submitted to MSU for reimbursement.

6          So was this one, Lansing -- BUD is Budapest --

7    Lansing, Budapest, Lansing.  Saying I came back on the 8th of

8    July.  Well, no.  About a month off, right?  A claim saying I

9    came back on the 8th of July.  Well, no, you didn't come back

10   until the 8th of August.  You see, it's kind of problematic for

11   the defendant when you're submitting claims saying, Hey, look

12   at me, I'm flying out of the United States, but you're provably

13   not even in the country.

14         And then on top of that, this claim here, you'll be

15   able to look at his credit card records seeing that that charge

16   right there, that flight was canceled and refunded before the

17   claim went.

18         Continuing with Budapest, you'll see a claim that is

19   submitted to RAS, which is the Robotics and Automation Society

20   which is an organization within IEEE.  So kind of think of RAS

21   as, you know, IEEE headquarters as distinguished from an IEEE

22   conference.

23         Anyway, so this claim is submitted to RAS.  Same

24   dates, came in 6-22, left on -- can you blow that up, please,

25   right there, a stitch?  RAS.  Left on the 6th of July.  Pull

1    back out, please.

2          Well, no, you left on the 1st of July and you didn't

3    come back until a month later, five weeks later.  But that

4    claim is submitted and reimbursed.

5          Then we go to IROS 2009.  You'll learn that all these

6    conferences have these acronym names for highly technical

7    titles.  In any event, so then this claim is submitted.  Same

8    time period, Lansing, Budapest, Lansing, for $10,540 to this

9    conference budget.  Well, you'll see that, okay, that one was

10   canceled and refunded to begin with.  And also when you look at

11   the original reservation, you'll see that the flight was going

12   to leave on 22 July, not 1 July, but the itinerary that was

13   submitted for reimbursement, the date was different.  It was to

14   depart on 1 July.  So when you're looking at this document set,

15   you'll see, well, okay, booked this flight for $10,500 on the

16   20th of July, after Budapest was already over, and submitted

17   it, but now the date of the document says 1 July.  And on top

18   of it it was canceled and refunded.  All in the same time

19   period.

20         And then you'll see this, ICRA 2014.  That's another

21   conference.  Same time period.  Same claims.  He can't possibly

22   be leaving the country when you're not even in the country.

23   And so when you consider all these documents, you'll be sitting

24   there thinking "Well, that's pretty neat.  One trip."  The

25   evidence will be that, yeah, he did go to Budapest.  He came in

1    from China to Lansing, went to Budapest, but then went off

2    someplace else and didn't come back for a while, and then

3    submitted all these different claims with all these different

4    bogus documents to score over $28,000 in reimbursements from

5    four different organizations.

6              Okay, thanks.

7              So the evidence you'll be looking at first off is

8    documents.  You'll look at travel claims with airline

9    itineraries.  You'll look at credit card records.  You'll have

10   the CBP Custom and Border Protection records.  You'll have

11   itineraries that were sent to conference treasurers so that

12   they would -- well, they -- so that the treasurer would write

13   checks.  You'll even look at limo records from sedan rides from

14   Okemos to Detroit International and back because a bunch of

15   fraudulent limo receipts were submitted.

16             Then you'll hear witness testimony.  The witnesses

17   will come from Michigan State University and IEEE.  The MSU

18   witnesses will be from the engineering school, and they will

19   testify about -- they will tell you a narrative of how in 2011

20   Dr. Xi took a sabbatical, that's an authorized leave from your

21   institution, to go work at and teach at a university in

22   Hong Kong.  And there are two Hong Kong universities involved,

23   so I'll just call it university 1 and university 2.  Anyway,

24   the engineering witnesses will tell you that, okay, 2011 he

25   takes a sabbatical and he goes to Hong Kong.  Then they will

1    tell you that he violated MSU policy by actually taking a job

2    there.  A paying job.  You're not supposed to take a paying job

3    with another institution when you're on sabbatical because you

4    are still an MSU professor.

5         You'll learn that, well, MSU found out about that and

6    contacted him and said, Hey -- I mean, they used fancier

7    words -- but they said, Knock it off and get back here.  And

8    then in 2014, in the summer of 2014, he came back and they

9    imposed -- they disciplined him, slap on the wrist.  What you

10   might consider a slap on the wrist.  A three-week suspension.

11   And they counseled him, and it was all agreed, okay, you're

12   back at MSU, now you're going to be a good professor and you're

13   going to, you know, work for MSU and do your job.

14         Well, bear in mind that those exhibits we were just

15   looking at, September 2014, that trip to Budapest, so after he

16   comes back and gets counseled and gets reprimanded, he's still

17   off to the races submitting these sorts of claims.  And that's

18   why this whole aspect of his dealings with MSU about these jobs

19   in Hong Kong matters, because at the same time that MSU was

20   trying to figure out what he is doing over there and what his

21   employment status is and they are getting stonewalled, there's

22   this pattern of just not dealing squarely with MSU, with trying

23   to hide things.  At the same time that these travel claims are

24   being submitted to MSU.  That's why this business about

25   Hong Kong and his jobs over there matters.

1            So in any event, he comes back summer of 2014.  Then

2     summer of 2015 MSU finds out it looks like he's taken a job

3     with university 2 in Hong Kong, so they counsel him again and

4     they are going to reprimand him again and they tell him they

5     are going to impose a six-month suspension, and then in October

6     of 2015 Dr. Xi says "That's it, I resign."  Then no big

7     surprise, where does he go?  He starts that job in Hong Kong by

8     January 25th later in 2015.  So that will be the testimony, the

9     MSU testimony from the engineering school.

10           Then you'll hear testimony from the travel

11    department.  That will come in today.  The witnesses will

12    testify about the claims process.  MSU, we all know, is a big

13    national and international university.  They have employees,

14    professors, flying all over the country, all over the world.

15    So they have a travel department.  And these witnesses will

16    testify that there is an established process for submitting

17    reimbursement claims.  That it is absolutely essential that

18    when you submit reimbursement claims you submit genuine

19    documents.  And if it's airfare, they be genuine documents

20    showing not just the exact itinerary but the exact cost and the

21    exact amount that you paid.

22           You'll hear that there is no tolerance, that you

23    can't double dip.  If you have already been reimbursed for part

24    or whole -- I should say paid because there's a difference

25    between reimbursed and being paid -- if you've already been

1    paid for part of a trip, you have to disclose that.  You don't

2    get to have institution 1 pay you and then go to MSU and say

3    would you pay me also?  So you'll hear that you can't double

4    dip or triple dip or quadruple dip.

5           The witness from the travel department will talk

6    about how they only reimburse for genuine expenses and genuine

7    out-of-pocket expenses.  And only for expenses incurred on

8    behalf of MSU.

9           Finally, they will talk about how all of these travel

10   reimbursements -- or all or most of the travel reimbursements

11   that were paid to Dr. Xi came out of grant funding.  That is

12   someone outside the university wants to give the university

13   money, quite often because they want Dr. Xi to work on

14   something, and then they give MSU this money.  But the travel

15   people will tell you that's MSU money, and if you want to be

16   paid out of that MSU account, you go through the exact same

17   process to get paid out of any other MSU account.

18          And then you'll hear testimony from folks in the

19   financial department, and they will testify -- they will

20   explain to you how when someone gives money to MSU, that is

21   MSU's money.  Only MSU can authorize expenditures from those

22   accounts.  And they will only authorize it for legitimate

23   business purposes.  So that's part 1 of the case, is Dr. Xi's

24   dealings or misdealings with MSU.

25          The second part of the case will be IEEE, and you're

1    going to see the same pattern.  The exact same pattern that you

2    saw with MSU but with an added fact that made IEEE even more

3    vulnerable to this fraud than MSU.  You're going to learn that

4    Dr. Xi chaired -- he's a fellow at IEEE.  He's a big deal in

5    IEEE.  So he was the chair of numerous conferences in various

6    parts of the world.  And when IEEE puts on a conference, a

7    separate bank account is established for conference expenses.

8    And two people can draw out of the account, the chair and the

9    treasurer.  They can write checks on an IEEE conference

10   account.  So what was the added factor, you're probably asking

11   yourself, that made IEEE even more vulnerable than MSU?  Well,

12   it was the fact that for all these conferences the same guy was

13   the treasurer of those conferences.  And that guy is named --

14   and I practiced pronouncing this correctly, and I may not get

15   it right -- Weihua Sheng.  Sheng is spelled S-H-E-N-G.  So when

16   I say it's Dr. Xi and then Sheng.  Sheng is also a doctor.

17   He's a Ph.D. or a doctor of science.  He's also a doctor, and

18   he's a professor at Oklahoma State University.

19          Well, so the thing that made IEEE even more

20   vulnerable isn't just that Sheng was the treasurer for all

21   these conferences, it's that he's also an MSU graduate school

22   graduate.  You could say he owed his career to Dr. Xi because

23   he got his doctoral degree under Dr. Xi at MSU.  And he's also

24   a member of IEEE.  And we think the evidence is going to prove

25   that Dr. Xi took advantage of that relationship with Dr. Sheng.

1    And he took advantage of the fact that Dr. Sheng had little to

2    no accounting training.  He had no training on how to manage

3    these budgets.  He had no help to speak of.  He had a day job

4    being a professor at Oklahoma State University and being the

5    treasurer for other conferences that Dr. Xi was the chair of.

6    And he also had no real inclination to question Dr. Xi because

7    Dr. Xi was his mentor.  He looked up to Dr. Xi.  And Dr. Xi was

8    as big a wheel in IEEE as you can possibly be because he was a

9    fellow.

10           And Dr. Xi year after year sent an unbroken river, an

11   unbroken chain of receipts and itineraries to Dr. Sheng saying

12   "Pay me for these."  And that's what Dr. Sheng did.  He didn't

13   investigate.  He didn't compare.  He got receipts, he added

14   them up, and he wrote checks.  A lot of checks.  And this

15   worked great for Dr. Xi for a while, for quite a while, up

16   until the end -- up until after the ICRA 2014 conference.  ICRA

17   is the International Conference of Robotics and Automation.

18   Okay?  It's a big conference that IEEE puts on every year in

19   different parts of the world.  And ICRA 2014 was in Hong Kong

20   in early June.

21           Bear in mind, 2014, how many years -- the evidence

22   will show how many years had Dr. Xi been in Hong Kong?

23   Three years.  2011 to 2014.  Because he extended that

24   sabbatical.

25           So anyway, IEEE got word that there might be some

1    funny business.  They had some concerns about the ICRA 2014

2    conference, so they got all of the receipts that had been

3    submitted to Sheng.  And like I said, you'll find out he has no

4    accounting experience.  And you might find it almost comical

5    the way he tried to manage these receipts and stuff, but it's a

6    big banker's box full of receipts with sticky notes on them and

7    his handwritten notes saying, okay, these receipts add up to

8    this, I'll write these two checks.

9           So anyway, IEEE gets ahold of the big ICRA box and

10   they turn that over to an outside auditor.  A real auditor.  A

11   company called Grant Thornton.  And Grant Thornton deep dives

12   into that box and they find out, well, let's see, Dr. Xi was

13   reimbursed for receipts supposedly incurred in 66 different

14   cities all paid out of the ICRA 2014 account.  66 different

15   cities.  To put on a conference in the town where you live,

16   Hong Kong?

17          Grant Thornton compared all these receipts and said,

18   "Wait a minute, this is impossible.  You can't have been here

19   at the same time you were here.  You can't have flown that way

20   when you were supposedly flying this way."  And how many checks

21   in total were written out of the ICRA 2014 conference?  Well,

22   you're going to find that Weihua Sheng wrote $470,000 worth of

23   checks to Dr. Xi out of the ICRA 2014 account.

24          And then you'll see evidence, as was forecasted up

25   there just a minute ago, that some of the stuff that was sent

1    to be reimbursed out of ICRA 2014 was also sent to MSU so he

2    could get paid.

3              Now, Sheng will be here to testify, and one of the

4    things he's going to tell you is that he kept boxes of

5    receipts.  The way he kept -- if you want to call it keeping

6    track -- the way he kept track of the ICRA stuff, he did the

7    same thing with these other conferences where he was the

8    treasurer and Dr. Xi was the chair.  And that he told the FBI,

9    "Yeah, I've got the other boxes back in my office."  And he'll

10   tell you that, well, not surprisingly, the FBI said, "Okay,

11   great.  Here is a grand jury subpoena.  Turn that stuff over."

12   And then the FBI dove into those boxes.  And what did they see?

13   The same pattern.  Same big checks.  Same double submissions.

14   Same air flights that couldn't have happened, didn't happen.

15             So the bottom line we think, we're confident, is that

16   the evidence is going to prove that Dr. Ning Xi leveraged his

17   status as a big deal in his field -- and there is no denial

18   that he is a big deal in the field of nanorobotics, he is known

19   the world over -- the evidence is going to show that he

20   leveraged his status as a big deal in his field and he

21   exploited his positions of trust and respect at both MSU and

22   IEEE, and he exploited his relationship with his protege and

23   really subordinate within the organization, Weihua Sheng, to go

24   wherever he wanted, whenever he wanted, to do whatever he

25   wanted, and to stick MSU and IEEE with the bill.  Thank you.

1         I certify that the foregoing is a correct excerpt

2    transcript from the record of proceedings in the above-entitled

3    matter.

4         I further certify that the transcript fees and format

5    comply with those prescribed by the court and the Judicial

6    Conference of the United States.

7

8    Date:  June 24, 2019

9

10                        **/s/ Glenda Trexler**

11                        _____
                          Glenda Trexler, CSR-1436, RPR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25