1       UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF MICHIGAN
2         SOUTHERN DIVISION

3 ————————————————————————————————————

4 UNITED STATES OF AMERICA,

5        Plaintiff,
             DOCKET NO. 1:18-cr-226
6 vs.

7

8 NING XI,

        Defendant.
9 ————————————————————————————————————/

10

11   EXCERPT TRANSCRIPT FROM VOLUME II OF JURY TRIAL

12      TESTIMONY OF BRUCE FOWLER

13   BEFORE THE HONORABLE ROBERT J. JONKER, CHIEF JUDGE

14       GRAND RAPIDS, MICHIGAN

15       June 19, 2019

16

17 Court Reporter:   Glenda Trexler
          Official Court Reporter
18         United States District Court
          685 Federal Building
19         110 Michigan Street, N.W.
          Grand Rapids, Michigan 49503
20

21 Proceedings reported by stenotype, transcript produced by

22 computer-aided transcription.

23

24

25

```
 1    A P P E A R A N C E S:

 2    FOR THE GOVERNMENT:

 3         MR. HAGEN W. FRANK
           UNITED STATES ATTORNEY'S OFFICE
 4         330 Ionia Avenue, N.W.
           P.O. Box 208
 5         Grand Rapids, Michigan 49501-0208
           Phone:  (616) 456-2404
 6         Email:  Hagen.frank@usdoj.gov

 7         MR. CLAY STIFFLER
           UNITED STATES ATTORNEY'S OFFICE
 8         330 Ionia Avenue, N.W.
           P.O. Box 208
 9         Grand Rapids, Michigan 49501-0208
           Phone:  (616) 456-2404
10         Email:  Clay.Stiffler@usdoj.gov

11    FOR THE DEFENDANT:

12         MR. RONALD S. SAFER
           RILEY, SAFER, HOLMES & CANCILA, LLP
13         70 West Madison Street, Suite 2900
           Chicago, Illinois 60602
14         Phone:  (312) 471-8736
           Email:  rsafer@rshc-law.com

15
           MS. VALARIE HAYS
16         RILEY, SAFER, HOLMES & CANCILA, LLP
           70 West Madison Street, Suite 2900
17         Chicago, Illinois 60602
           Phone:  (312) 471-8781
18         Email:  vhays@rshc-law.com

19         MR. JOSEPH RICHARD COBURN
           RILEY, SAFER, HOLMES & CANCILA, LLP
20         121 West Washington Street, Suite 402
           Ann Arbor, Michigan 48104
21         Phone:  (734) 773-4913
           Email:  jcoburn@rshc-law.com

22

23                        *   *   *   *   *

24

25
```

```
 1                              Grand Rapids, Michigan
 2                              June 19, 2019
 3                         EXCERPT OF PROCEEDINGS
 4          MR. FRANK:  The United States calls Special Agent
 5     Bruce Fowler, FBI.  For the record, Your Honor, we'll be
 6     re-calling Agent Fowler later on in our proofs as well.
 7          THE COURT:  All right.
 8                              BRUCE FOWLER
 9                    (The oath was administered)
10          THE WITNESS:  I do.
11          THE CLERK:  Thank you.
12          THE COURT:  Mr. Fowler is going to be one of the
13     people who can stay in the room because he's the case agent for
14     the government which is like the party in the case.
15          And the other thing about this witness is that you're
16     going to hear him later in the case too.  The government and
17     the defense and I have consulted and agreed that Mr. Fowler can
18     break up his testimony.  He's got a lot to talk about, but it
19     will be more intelligible, the parties think, for you if he
20     does it in two separate bites.  This first bite will be a
21     pretty short one, and then it will be up to the defense to
22     decide how much, if anything, they want to cross-examine the
23     agent now, or maybe they just want to wait until later for
24     their cross when we've heard the rest of what this witness has
25     to say.
```

1    But we'll begin with whatever questions you have for

2    the witness now.

3         *MR. FRANK:*  Thank you, Your Honor.

4                        DIRECT EXAMINATION

5    *BY MR. FRANK:*

6    *Q.*   You are a special agent with the FBI?

7    *A.*   Yes, that's right.

8    *Q.*   How long have you been with the Bureau?

9    *A.*   About eight years.

10   *Q.*   And you're assigned to the Lansing office of the

11   Detroit Division?

12   *A.*   Yes, that's right.

13   *Q.*   And were you the lead investigator in this case?

14   *A.*   Yes, I was.

15   *Q.*   In early 2015 did you begin looking into Dr. Xi's

16   activities as an MSU professor specifically with respect to his

17   finances?

18   *A.*   Yes.

19   *Q.*   And what is Dr. Xi's position -- well, at that time where

20   and how was Dr. Xi employed?

21   *A.*   He was a distinguished professor in the Department of

22   Electrical and Computer Engineering at Michigan State

23   University.

24   *Q.*   And was one of the first steps in your investigation to

25   subpoena financial records of his from Michigan State

1    University Federal Credit Union?

2    A.   Yes, it was.

3    Q.   And just for the sake of the court reporter, I'll just

4    start referring to that as MSU FCU.

5         When you obtained those records did anything strike you as

6    unusual right off the bat?

7    A.   Yes.  The first thing that I noticed were a large amount

8    of check deposits from IEEE totaling several hundreds of

9    thousands of dollars.

10   Q.   Did you also see income coming in from MSU?

11   A.   I did.  That also struck me as odd because I knew Dr. Xi

12   was on sabbatical leave from MSU beginning in 2011 until 2012,

13   and then he entered a leave-without-pay phase from 2012 until

14   approximately mid 2014.  So I saw well over a hundred thousand

15   dollars being deposited from MSU during that time.

16   Q.   Now, you mentioned IEEE.  The jury has heard about that in

17   opening statements, but there's nothing in evidence about it

18   yet.  IEEE is an acronym.  What does it stand for?

19   A.   The Institute of Electrical and Electronics Engineers.

20   Q.   What sort of organization is that?

21   A.   It's a giant organization composed of engineers from all

22   over the world, several hundred thousand engineers, and one of

23   the primary charters of IEEE is to put on conferences,

24   sometimes up to 1,700 conferences in one year, all over the

25   world.

1  Q.   So then IEEE is a professional organization with worldwide

2  reach?

3  A.   Yes, that's right.

4  Q.   Looking at those financial records did you see anything

5  that struck you as interesting with respect to payments to

6  American Express and Chase credit card accounts?

7  A.   Yes.  When reviewing the documents at MSU FCU, I noticed

8  almost every month ranging from $10,000 payments up to more

9  than $50,000 payments per month to credit card statements.

10 Q.   Of those two entities, AmEx, American Express, and Chase?

11 A.   Primarily American Express and J.P. Morgan Chase, yes.

12 Q.   Did you then obtain through the legal process the records

13 for those credit card issuers?

14 A.   I did.

15 Q.   And did you examine the sorts of charges that were on

16 those cards?

17 A.   Yes, I did.

18 Q.   What sort of pattern, if any, did you see?

19 A.   The first thing that jumped out to me really was a

20 constant stream of international travel.  I saw purchases from

21 all over the world that were really never-ending.  It appeared

22 as though Dr. Xi would travel from one country to another to

23 another to another almost in a constant pattern.  Oftentimes I

24 would see very expensive purchases for dinners.  Three, four

25 thousand dollars.  I saw a substantial amount of airfare

1    purchases.  Oftentimes many of those would be purchased and

2    then refunded and I would see the refund go back on the

3    credit card for the exact same price.

4    Q.    In the course of your investigation did you determine

5    whether Dr. Xi is a member of IEEE and if so if he had any

6    special rank, for lack of a better term, within the

7    organization?

8    A.    Yes.  I determined that IEEE -- that Dr. Xi rather was a

9    fellow at IEEE, which is a very prestigious rank within that

10   organization.

11   Q.    What, if anything, did you learn about his activities with

12   respect to conferences that were hosted by IEEE?

13   A.    Dr. Xi was the general chair which is the primary person

14   in charge of setting up these conferences, and he had set up

15   multiple conferences for IEEE dating back to 2005 through 2015.

16   Q.    And when conferences were set up, are bank accounts

17   established for each conference under the auspices of IEEE?

18   A.    Yes, that's right.

19   Q.    And who has check-writing authority on those conference

20   accounts?

21   A.    Typically only two individuals would have check-writing

22   authority, the general chair and the treasurer for the

23   conference.

24   Q.    Now backing up to the MSU payments that you saw that had

25   gone into the account while he was not in an MSU pay status, in

1   China, did you start digging into what the basis of those

2   payments was?

3   A.   I did.  Ultimately I was able to determine that the

4   payments I was seeing deposited into the MSU FCU account from

5   MSU were travel reimbursement payments.

6   Q.   And did you obtain claims records that had been submitted

7   to produce those payments?

8   A.   I did.

9   Q.   That is claims -- I said claims records.  Records of

10  claimed -- travel claims that had been submitted to MSU.

11  A.   Yes, I did.

12  Q.   And when you examined those records, what, if anything,

13  did you see with respect to claimed air travel?

14  A.   When I began examining the airfare, which accounted for

15  the vast majority of the reimbursement expense, I would look at

16  the credit card statements because the airfare receipts would

17  identify the type of payment.  So oftentimes it would say

18  American Express ending 3009.  I would then pull up the

19  American Express 3009 statements and I would attempt to find

20  the ticket number or the price of the flight.  Oftentimes I

21  could not find that or I would see that that flight was

22  purchased and then almost immediately refunded.

23  Q.   At about the same time did you start obtaining records

24  from IEEE?

25  A.   Yes.

1    Q.    Now, the term -- I think both defense and I used the term

2    RAS, and then the defense also brought up an acronym NTC with

3    respect to IEEE.  What does RAS refer to?

4    A.    RAS is the Robotics and Automation Society.  So it is a

5    society under the umbrella of IEEE.  It's a part of IEEE.

6    Q.    Okay.  And what is NTC?

7    A.    NTC is the Nanotechnology Council.  It's comprised of

8    several societies.  RAS is one of those that comprises NTC.

9    Q.    Did you obtain RAS -- or rather quote-unquote expense

10   reports that had been submitted to RAS and NTC?

11   A.    Yes, I did.

12   Q.    Who had submitted those expense reports?

13   A.    Dr. Xi had submitted those.

14   Q.    And what is the nature of these documents, the expense

15   reports?

16   A.    Those were also travel reimbursements.

17   Q.    Travel reimbursement claims?

18   A.    Travel reimbursement claims, yes.

19   Q.    And what did you see with respect to international airfare

20   itineraries in the claims that have been submitted to RAS and

21   NTC?

22   A.    A substantial amount included at least one international

23   airfare.

24   Q.    Did you obtain checks that -- well, let's back up for a

25   second.  We already talked about how -- you talked about how

1    each conference would have its own bank account.  Did you

2    obtain checks that had been written on conference accounts for

3    conferences that had been chaired by Dr. Xi?

4    A.   Yes.

5    Q.   And what did you find there?

6    A.    Initially I found that the checks that I had seen

7    deposited from IEEE into Dr. Xi's MSU FCU account, the checks

8    themselves would identify the conference that the check was

9    written from.  For instance, there was in 2009 a conference

10   called IROS based in St. Louis, so the check -- there would be

11   a suite of checks that would say "IROS 2009" on the top.  So I

12   could determine that those checks belonged to that conference.

13        Another example would be the ICRA 2014 conference that

14   we'll be talking about a lot, and that would say "ICRA 2014" at

15   the top, so I know that check belonged to that conference.

16   Q.   And was there a pattern, if any, with respect to who was

17   writing those checks?

18   A.    Yes.  Every check from an IEEE conference account was

19   signed by Weihua Sheng.

20   Q.   And where were those checks deposited?

21   A.   They were all deposited into Dr. Xi's MSU FCU account.

22   Q.   And to whom were all those checks made out?

23   A.   They were all made out to Dr. Xi.

24   Q.   And were these all endorsed on the back with a signature

25   that appeared to you to be that of Dr. Xi?

1   A.   Yes, they were.

2   Q.   Did you learn that IEEE had had an external audit

3   performed on this ICRA 2014 conference?

4   A.   I did, yes.

5   Q.   And ICRA -- I don't think it's in the record yet -- stands

6   for International Conference on Robotics and Automation?

7   A.   That's right.

8   Q.   Where and when was that conference held?

9   A.   The first week of June 2014 in Hong Kong.

10   Q.   How many checks did you see written from the ICRA 2014

11   conference to Dr. Xi?

12   A.   27, I believe.

13   Q.   And what was the total amount?

14   A.   $470,000 plus.  So 470,139, I believe.

15   Q.   You mentioned that the -- they were all signed by

16   Weihua Sheng.  Who is this gentleman?

17   A.   Weihua Sheng was the treasurer for all of the conferences

18   that we looked at in this case, IROS 2009, ICRA 2014.  We'll

19   mention some more later on.  Weihua Sheng also received his

20   Ph.D. under the supervision of Dr. Xi at MSU, and Weihua Sheng

21   is now a professor at Oklahoma State University.

22   Q.   At some point in your investigation did you obtain a box

23   of receipts from IEEE that had been submitted to Weihua Sheng

24   with respect to the ICRA 2014 conference?

25   A.   I did, in the summer of 2017.

1    *Q.*   And with respect to the claims for reimbursement for air

2    travel what did you find in the box?

3            *MR. SAFER:*   I object to the characterization of that,

4    Your Honor.

5            *THE COURT:*   Why don't you rephrase it so that the

6    witness can describe what he saw or what -- how he would use

7    it.

8    *Q.*   *(BY MR. FRANK)*   Did you find what appeared to be airfare

9    itineraries in the ICRA 2014 box?

10   *A.*   I did.

11   *Q.*   And how would you describe those, just very general

12   description, those air itineraries?

13   *A.*   The air itineraries were very similar to those that I had

14   seen from MSU travel reimbursements, and at that point because

15   I was obtaining so many travel reimbursements that included

16   international travel, I created a spreadsheet that would track

17   the submissions to MSU, the travel submissions to IEEE, and the

18   travel submissions to RAS and NTC so I could chronologically

19   look at the flights that were submitted in support of each

20   reimbursement to each agency.

21   *Q.*   Okay.  So you've got the MSU documents, the RAS documents,

22   the ICRA 2014 documents, and you've charted it out?

23   *A.*   Yes.

24   *Q.*   Did you identify any patterns with respect to the airfare

25   itineraries that were included -- well, that you had examined?

*A.*   Yes, there were several patterns.  The first would be I identified several flight itineraries that had the same ticket number but the itinerary would be different.

   Next I identified several of the exact same itinerary that was submitted to both MSU and IEEE.  I also, when I looked at the ticket numbers for each of the documents and looked at the credit card record, I saw the same pattern that I had seen previously where a ticket would be purchased, canceled, and refunded, a ticket would not appear at all on a credit card statement, or a ticket would appear but the cost of the ticket was substantially lower or the dates of the travel were different than what appeared on the flight itinerary.

*Q.*   You mentioned the cost of the ticket being lower.  Lower than what?  The cost of the ticket from the third-party records being lower.  Lower than what?

*A.*   Lower than the amount on the flight receipt that was submitted by Dr. Xi either to MSU or IEEE.

*Q.*   What, if anything, did you see with respect to dates and locations of claimed travel?

*A.*   Oftentimes I would see overlapping dates and locations of travel.  For instance, I would see one flight leaving -- and I'll just make up a date -- on September 6th, flying from Detroit to Hong Kong, and I would see a different flight, a different ticket number also leaving Detroit traveling to a different city and ending up in Japan on the exact same day.

1    Q.   At some point in the investigation did you obtain airline

2    records from air carriers?

3    A.   I did, yes.

4    Q.   Any carriers in particular?

5    A.   Yes, primarily United, Lufthansa, and Delta.  It appeared

6    to me in the investigation that the vast majority of the travel

7    reimbursements involved those air carriers.  United and Delta

8    in particular.  We also obtained the records that Orbitz had in

9    addition to those.

10   Q.   Did you start comparing the air itineraries that had been

11   submitted against airline records?

12   A.   I did.  What I saw largely substantiated what was on the

13   spreadsheet and what had been identified as overlapping

14   airfare.  The air carrier's records often would say that a

15   particular ticket number did not exist in their system for

16   Dr. Xi or it would provide the actual document for a given

17   ticket number that would not correspond with the flight

18   itinerary that was submitted to either MSU or IEEE.

19        And in addition to that, sometimes I would see the airfare

20   was lower than what was submitted on the reimbursement claim

21   and oftentimes it would be as low as five, 10, or $15, which to

22   me would indicate that miles had been used potentially and that

23   was some type of service fee or something.

24   Q.   But, for instance, where you would see a service fee on

25   more than one occasion, what was the -- was the amount that was

1    claimed or submitted more consistent with full fare?

2    A.    Yes, absolutely.   The fare, for instance, that was

3    submitted to IEEE or MSU would be approximately $2,000, but the

4    actual ticket amount would be $15 that was spent out-of-pocket.

5    Q.    Did you obtain records from U.S. Customs and Border

6    Protection?

7    A.    I did.

8    Q.    What sort of records?

9    A.    U.S. Customs and Border Protection or CBP, they keep

10   records of all travel going into and out of the United States.

11   So when a ticket is booked by an air carrier, within 24 or

12   48 hours that information is sent into a system that CBP has

13   access to.   And then I talked to a colleague at CBP and asked

14   him to pull all the information for Dr. Xi so I could see when

15   he entered and when he exited the United States from a given

16   time period.

17   Q.    And was that information provided to you?

18   A.    It was.

19   Q.    And did you compare flight itineraries that had been

20   submitted and reimbursement claims against entry/exit records

21   that were provided by CBP?

22   A.    I did.   Oftentimes I would see that on a given claim that

23   was submitted by Dr. Xi to MSU or IEEE that the claim and the

24   flight itinerary would show Dr. Xi leaving the United States or

25   coming into the United States when CBP had no record of Dr. Xi

1    being in the United States during that time.

2    Q.   Did you obtain records from a business called or that had

3    been called 24/7 Limousine?

4    A.   Something like that.  Yes, I did.

5    Q.   What kind of records were those?

6    A.   Initially they provided a spreadsheet that was a data pull

7    from their database that showed all of the travel that Dr. Xi

8    had taken with this 24/7 Limo Service.  Usually it indicated

9    that the service would be either from Dr. Xi's house in Okemos

10   to the Detroit airport or vice versa, from the airport back to

11   his home in Okemos.

12   Q.   Had you collected numerous receipts from this business

13   that had been submitted in travel reimbursement claims?

14   A.   Yes.  Oftentimes the limo receipts, the 24/7 Limousine

15   receipts would be included in a travel reimbursement claim that

16   Dr. Xi would submit to MSU and IEEE.

17   Q.   And comparing the company's records of services that were

18   provided against the receipts that had been submitted, did you

19   see a pattern?

20   A.   I did.  I saw a very similar pattern that I saw with the

21   airfare receipts.  Some -- there's no question that Dr. Xi took

22   several trips with this company to and from the airport.

23   However, the documents that were submitted would have different

24   invoice numbers.  The amounts would be inflated on the

25   reimbursement claims compared to what the 24/7 Limo Company

1    records showed.  And then oftentimes a given invoice that was

2    submitted to MSU or IEEE would not show up at all on the

3    24/7 Limousine travel records.

4    Q.    Now, you talked a little bit about Weihua Sheng who I

5    guess -- Dr. Sheng.  Did you determine whether he was the

6    treasurer on conferences other than ICRA 2014?

7    A.    Yes, he was.

8    Q.    And did you subpoena boxes from him for receipts -- boxes

9    from him of receipts that had been submitted to him in

10   reimbursement claims from those conference accounts?

11   A.    Yes.

12   Q.    Did you examine the contents of those boxes?

13   A.    I did.

14   Q.    What sort of pattern did you see?

15   A.    I saw a very similar pattern that I had seen with the

16   contents of the ICRA 2014 box.  That being when I checked the

17   credit card statements and the airline records that several of

18   the receipts that I was looking at in these other conference

19   boxes, for instance, IROS 2009, would either not show up on the

20   credit card statement or the airline carrier's records or I

21   would see on the credit card statement that that ticket number

22   had been purchased and refunded in full.

23   Q.    And did you find documents in those boxes that had also

24   been submitted in reimbursement claims to MSU?

25   A.    I did.  I saw multiple submissions to both the IEEE

1    conference that that box contained receipts for as well as

2    Michigan State University or different IEEE conferences with

3    the same receipt.

4    Q.   And then did you calculate the amount of money that had

5    been paid by MSU and by IEEE to Dr. Xi based upon the documents

6    that you're describing that contained irregularities?

7    A.   Yes, I did.

8    Q.   And what was the combined total approximately?

9    A.   The combined total was approximately $550,000.

10   Q.   Thank you.

11           MR. FRANK:  Pass the witness, Your Honor.

12           THE COURT:  All right.  And are you going to cross

13   now or --

14           MR. SAFER:  Just briefly, Your Honor.  Sort of at the

15   same level.

16           THE COURT:  Okay.  Fair enough.

17                     CROSS-EXAMINATION

18   BY MR. SAFER:

19   Q.   Good morning, Special Agent Fowler.

20   A.   Good morning.

21   Q.   So you testified about patterns that you saw.  You're

22   going to come back later and talk about specifics --

23   A.   Yes.

24   Q.   -- is that right?

25   A.   Yes.

1    Q.   So we'll chat about those specifics when you do that.  But

2    I wanted to see what you did and didn't do.

3         So you had all of the airline records for Dr. Xi; is that

4    right?

5    A.   I requested all of the airline records pertaining to

6    Dr. Xi, that's right.

7    Q.   And you got a ton of them, correct?

8    A.   I did get quite a few, yes.

9    Q.   And you had all of the credit card information for Dr. Xi?

10   A.   I had all of the U.S.-based credit card information for

11   Dr. Xi.

12   Q.   Now, when you talked to the jury about seeing these

13   patterns, did you look at whether Dr. -- so let me back up.

14   I'm sorry.

15        So for Michigan State University you had a reimbursement

16   form that you also subpoenaed, correct?

17   A.   Right.

18   Q.   And you had all of those travel records?

19   A.   Yes.

20   Q.   And on that -- those reimbursement forms, there was a

21   purpose to the travel?

22   A.   Right.

23   Q.   And it said where Dr. Xi was traveling to for that

24   purpose?

25   A.   Yes.

1    *Q.*   Did you look at the travel records to see whether Dr. Xi

2    traveled to those places?

3    *A.*   Yes.  Sometimes he did travel to those places.

4    *Q.*   And is it your testimony that for Michigan State

5    University sometimes he did not travel to those places?

6    *A.*   I would have to look specifically at Michigan State

7    University, but what I can say for certain --

8    *Q.*   Well, I'm asking you about Michigan State University, sir,

9    and you know that in every one of the 111 reimbursement forms

10   he traveled to the place he said he traveled, don't you?

11   *A.*   What I can say is that the itinerary he submitted to MSU

12   was not the itinerary he flew.

13   *Q.*   That's not the question.  The question is he puts down

14   where he's going to, and you know that on all 111 packets he

15   flew to that destination.

16   *A.*   I don't know that to be true.

17   *Q.*   Did you examine that?

18   *A.*   I examined several things, yes.  Sometimes the flight

19   record would show he flew into Narita in Japan.  I don't know

20   if he continued flight into China, for instance.

21   *Q.*   Did you look for the specific flights that he took to get

22   to those places as to what he actually spent?

23   *A.*   The only time I could actually see that is if the airline

24   record produced an actual document that Dr. Xi flew, and, yes,

25   I would consider that.  I considered it with Lufthansa as well

1    with the around-the-world tickets.

2    Q.   Okay.  Good.  And we'll discuss that when you discuss the

3    specific examples.

4         You started by talking about a constant stream of

5    never-ending travel and that there was airfare and then refunds

6    at times.

7    A.   Yes.

8    Q.   But there were remaining balances for thousands and tens

9    of thousands of airfare charges, correct?

10   A.   Yes.

11   Q.   And indeed you came to learn through your investigation

12   that one way to get a price on a trip is to book that flight

13   and then cancel it that same day, correct?

14   A.   Right.  The airlines told me they did not appreciate

15   people doing that.

16   Q.   But that people did that, whether the airlines appreciated

17   it or not.

18   A.   Some people did that, yes.

19   Q.   And with regard to -- you said there were expensive

20   dinners you told this jury?

21   A.   That's right.

22   Q.   Those were -- you know that those were IEEE events,

23   weren't they?

24   A.   I don't know that, no.

25   Q.   Did you -- you talked to the IEEE people, didn't you?

1   *A.*   I saw what was submitted to IEEE, but that doesn't mean

2   that that was for an IEEE event.

3   *Q.*   So you don't know what it was for?

4   *A.*   I think only Dr. Xi knows what it was for.

5   *Q.*   Well, IEEE knows what it was for, don't they?

6           *MR. FRANK:*  Objection, argumentative.

7           *THE COURT:*  Well, it's cross-exam, and he can

8   certainly probe what this witness used or didn't use as a basis

9   for the conclusions he testified to on direct.

10          Go ahead.

11          *THE WITNESS:*  I'm sorry, can you ask the question

12  again?

13  *Q.*   *(BY MR. SAFER)*  You know that there were -- there was

14  money spent by Dr. Xi for IEEE events at these IEEE

15  conferences, correct?

16  *A.*   At the events, yes, I do.

17  *Q.*   Okay.  Now, with regard to -- you testified that he opened

18  bank accounts for these conferences, right?

19  *A.*   Right.

20  *Q.*   You know that there are two types of bank accounts that

21  can be used for conferences, right?

22  *A.*   Yes.

23  *Q.*   One of them is an IEEE what they call concentration bank

24  account, right?

25  *A.*   Yes.

1    Q.   And another account is an account in the conference name

2    that is not an IEEE account, correct?

3    A.   Yes.

4    Q.   You know that on -- from your investigation that in 90 to

5    95 percent of the foreign conferences non-IEEE accounts are

6    used by general chairs, correct?

7    A.   I don't know that, no.

8    Q.   You know from your investigation that every single

9    conference that Dr. Xi did, that he ran, he used an IEEE

10   concentration bank account, correct?

11   A.   I believe that's the case, yes.

12   Q.   One last thing.  When Dr. Xi received reimbursements -- at

13   times Dr. Xi received reimbursements from other conferences,

14   right?  These expense accounts you testified about.

15   A.   He did receive, yes, payment from other conferences.

16   Q.   And those were checks -- and he received reimbursement

17   checks, correct?

18   A.   He received payments, yes.

19   Q.   And those -- those checks that he received were from other

20   IEEE treasurers, right?

21   A.   No.

22   Q.   Who were they from?

23   A.   They were from Weihua Sheng.

24   Q.   On the other conferences.  He received -- other

25   conferences your testimony is those were from Dr. Sheng as

1    well?

2    A.   Yes.

3              MR. SAFER:  No further questions, Your Honor.

4              THE COURT:  All right.  Any redirect at this time?

5                        REDIRECT EXAMINATION

6    BY MR. FRANK:

7    Q.   In answer to one of Mr. Safer's questions when he was

8    saying that with respect to MSU do you know whether Dr. Xi

9    always went where he told MSU he was going, you started to

10   answer and said that he didn't fly -- quite often didn't fly

11   the itineraries that he claimed to have flown.  Do you want to

12   explain that a little bit?

13   A.   Yes.  For instance, in all of the instances that we

14   identified as fraud, the itinerary that Dr. Xi --

15             MR. SAFER:  Well, I object to that characterization,

16   Your Honor.

17             THE COURT:  Whose characterization, the witness or

18   the questioner?

19             MR. SAFER:  When he just said he identified as fraud.

20             THE COURT:  Well, you can cross-examine on that, but

21   that's the witness's response, so that's what we'll take.

22             Go ahead.

23             THE WITNESS:  As I was saying, all of the identified

24   fraud instances included airfare that Dr. Xi submitted to MSU

25   that included a ticket number and a given itinerary that he

```
 1    claimed to have flown in support of an alleged business purpose
 2    for Michigan State University.  When I checked those records
 3    that he submitted to MSU with the airline and with the
 4    credit card statements, they did not match.  The ticket numbers
 5    usually did not match.  The itineraries didn't match.
 6    Something did not match in order for us to identify that ticket
 7    as fraud and that indicated it was not a genuine airfare that
 8    Dr. Xi used.
 9    Q.   (BY MR. FRANK)  But sometimes -- on more than one instance
10    you found indicators that he had -- regardless whether it was
11    the exact itinerary or something -- at about the same time that
12    he told MSU he was going somewhere he did go there?
13    A.   Yes.
14    Q.   Did you find more than one instance where he didn't come
15    back when he said he was going to?
16    A.   Yes, I identified several instances where Dr. Xi would
17    identify a place that he would go to and he would tell I -- he
18    would tell MSU rather -- I'm flying, for instance, from Detroit
19    to Hong Kong back to Detroit, and then I would never see him
20    enter back into the United States from Hong Kong.  He would
21    never return to the United States.  Or vice versa.  He would
22    enter the United States and say he was going back to Hong Kong
23    and I would see him go to Europe.
24    Q.   So, for instance, did you see a travel claim submitted
25    in -- and correct me if I get the time period wrong -- but
```

1    submitted in July of 2014 --

2         *THE COURT:*  Well, we're getting into specific

3    instances.  I think we're going beyond the scope of your

4    original direct and the scope of cross.  The whole point was

5    that this was going to be a summary overview for both sides and

6    we're going to get into the specifics later.

7         *MR. FRANK:*  All right.  We'll hold off on that, then,

8    Your Honor.

9         *THE COURT:*  All right.

10   *Q.   (BY MR. FRANK)*  However, Mr. Safer also asked you about

11   this, the fact that these bank accounts, the IEEE conference

12   accounts were set up concentration as bank accounts.  And the

13   defense had made a point in their opening statement that these

14   accounts were scrutinized by IEEE.  Are you aware of any policy

15   at IEEE about a threshold amount that would cause them to

16   scrutinize checks?

17   *A.*   Yeah.  Typically --

18        *MR. SAFER:*  I object, Your Honor.  It's beyond the

19   scope, and IEEE should testify to that and will.

20        *MR. FRANK:*  They will, but I think it's within the

21   scope --

22        *THE COURT:*  Well, what did he ask in cross?  You

23   referenced back to the opening statement, and that's true

24   enough, but I don't remember anything in cross that asked this

25   witness about specific check thresholds.  He was talking about

1   a different account, whether it was inside or outside of IEEE.

2   　　　　　MR. FRANK:  That's right.  My theory was, well, he

3   brought up concentration accounts, so --

4   　　　　　THE COURT:  Well, it's beyond the scope, and you can

5   get into that later if you re-call the witness, but I think

6   it's beyond the scope of this cross.

7   　　　　　MR. FRANK:  All right, Your Honor.  That's all we

8   have on redirect now.

9   　　　　　THE COURT:  All right.  Is there any recross?

10   　　　　　MR. SAFER:  No, Your Honor.  Thank you.

11   　　　　　THE COURT:  All right.  So you get to return to the

12   table, but you'll be back.

13   　　　　　　　　　　*   *   *   *   *

14   　　　　　I certify that the foregoing excerpt is a correct

15   transcript from the record of proceedings in the above-entitled

16   matter.

17   　　　　　I further certify that the transcript fees and format

18   comply with those prescribed by the court and the Judicial

19   Conference of the United States.

20

21   Date:  June 24, 2019

22

23   　　　　　　　　　　　　**/s/ Glenda Trexler**

24   　　　　　　　　　　　　Glenda Trexler, CSR-1436, RPR, CRR

25